# Exhibit A

Annika K. Martin (*pro hac vice forthcoming*)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
akmartin@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  212.355.9500
Facsimile:  212.355.9592

Mark P. Chalos (*pro hac vice forthcoming*)
Betsy A. Sugar (*pro hac vice forthcoming*)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
mchalos@lchb.com
bsugar@lchb.com
222 2nd Ave. S., Suite 1640
Nashville, TN 37201
Telephone:  615.313.9000
Facsimile:  615.313.9965

Michelle A. Lamy (SBN 308174)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
mlamy@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000

Vanessa Baehr-Jones (SBN 281715)
**BAEHR-JONES LAW PC**
vanessa@advocatesforsurvivors.com
4200 Park Boulevard, No. 413
Oakland, CA 94602
Telephone:  510.500.9634

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| JANE DOE 1, JANE DOE 2, a minorJANE DOE 3, JANE DOE 4, and JANE DOE 3, a minor,5<br><br>Plaintiffs,<br><br>v.<br><br>X.AI CORP. and , X.AI LLC, X.AI HOLDINGS LLC, STABILITY AI U.S. SERVS. CORP., and STABILITY AI, INC.<br><br>3529222.1<br><br>Defendants. | Case No.  5:26-cv-2246-PCP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

**TABLE OF CONTENTS**

**Page**

I.      NATURE OF THE ACTION .................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................ ~~2~~3

III.    PARTIES ........................................................................................................... ~~2~~4

IV.     FACTUAL ALLEGATIONS ............................................................................. ~~3~~5

        ~~I~~a.      Generative Artificial Intelligence ("AI") ............................................ ~~3~~5

~~II~~V.    Availability and Use of Industry-Standard Guardrails to Prevent CSAM .......................... 4~~6~~

        a.      Proprietary Models................................................................................... 6

        b.      Open-Weight Models............................................................................... 8

~~III.~~VI.   xAI's Proprietary Generative AI Model Grok ................................................. ~~6~~10

        a.      xAI introduced Grok to the market~~6~~. .................................................. 10

        b.      xAI designed and marketed Grok's ability to make "spicy" content~~8~~. ..................... 11

        c.      xAI has and continues to profit from Grok's ability to make sexualized content~~13~~. 17

        d.      xAI has failed to report the CSAM it generates........................................ 20

        e.      Elon Musk's financial investment in and control of xAI........................ 22

VII.    Stability AI's open-weight generative AI models. ......................................... 22

        a.      Open-weight AI models. ....................................................................... 22

        b.      The development of Stability AI models. ............................................. 23

        c.      Stability AI's models are used by nudify apps to generate CSAM. ........................ 25

~~IV~~VIII.............................................................................. AI Large Language Model Licensing............................................................................................................ ~~15~~27

~~V~~IX.    AI-Generated Child Sexual Abuse Material is Illegal ...................................... ~~16~~28

~~VI~~X.    Plaintiffs Suffered Severe Harm from ~~xAI's~~ Defendants' Production of their AI-Generated CSAM .............................................................................................. ~~17~~29

        a.      Plaintiff Jane Doe 1............................................................................... ~~17~~29

        b.      Plaintiff Jane Doe 2............................................................................... ~~19~~32

        c.      Plaintiff Jane Doe 3............................................................................... ~~21~~33

        d.      Plaintiff Jane Doe 4............................................................................... 34

        e.      Plaintiff Jane Doe 5............................................................................... 37

~~VII.~~XI. Ongoing Harm From the Dissemination of Plaintiffs' CSAM Files ................................ ~~22~~38

XII.    CLASS ALLEGATIONS ................................................................................. ~~23~~39

XIII.   CAUSES OF ACTION.................................................................................... ~~25~~42

COUNT 1 Masha's Law: Production of Child Pornography 18 U.S.C. §§ 2255(a), 2251(a) (on behalf of all Plaintiffs and all Classes against all Defendants)......................................... 42

~~COUNT I~~ COUNT 2 Masha's Law: Production with the Intent to Distribute Child Pornography 18 U.S.C. §§ 2255(a), 2252A(a)(7) (on behalf of all Plaintiffs and ~~the Class~~ all Classes against all Defendants)............................................................................................. ~~25~~44

**TABLE OF CONTENTS**
**(continued)**

**Page**

COUNT II 3 Masha's Law: Distribution of Child Pornography 18 U.S.C. §§ 2255(a), 2252A(a)(2) (on behalf of all Plaintiffs and the xAI Class and Tennessee xAI Subclass against all the xAI Defendants)..............................................................26 45

COUNT III 4 Masha's Law: Possession of Child Pornography 18 U.S.C. §§ 2255(a), 2252A(a)(5)(B) (on behalf of all Plaintiffs and the xAI Class and Tennessee xAI Subclass against all the xAI Defendants)..............................................................27 47

COUNT 5 Obscene Visual Representations of the Sexual Abuse of Children 18 U.S.C. § 2252A(f)(1) (on behalf of all Plaintiffs and all Plaintiffs and all Classes against all Defendants)................................................................................ 48

COUNT IV COUNT 6 Trafficking Victims Protection Act, Beneficiary Liability 18 U.S.C. §§ 1595, 1594, 1591(a)(2) (on behalf of all Plaintiffs and the Class all Classes against all Defendants)..........................................................................................28 49

COUNT V California's Statutory Right of Publicity 7 Cal. Civ. Code § 3344 1708.86 (on behalf of all Plaintiffs and the Class all Classes against all Defendants) ...................................29 51

COUNT VI 8 California's Unfair Competition Law ("UCL") Cal. Bus. & Prof. Code § 17200, *et seq.* (on behalf of all Plaintiffs and the Class all Classes against all Defendants)..............30 53

COUNT 9 Tenn. Code §§ 39-17-1902–1904 (on behalf of Jane Does 1–3 and the Tennessee Subclass against all Defendants)................................................................ 54

COUNT VII COUNT 10 Strict Liability – Design Defect (on behalf of all Plaintiffs and the Class all Classes against all Defendants)................................................................32 55

COUNT VIII 11 Negligence – Design Defect (on behalf of all Plaintiffs and the Class all Classes against all Defendants)..............................................................................33 57

COUNT IX 12 Negligent Undertaking (on behalf of all Plaintiffs and the Class all Classes against all Defendants) ....................................................................................35 58

COUNT X 13 Negligence Per Se (on behalf of all Plaintiffs and the Class all Classes against all Defendants)..........................................................................................36 59

COUNT XI 14 Negligent Infliction of Emotional Distress (on behalf of all Plaintiffs and the Class all Classes against all Defendants)..........................................................36 60

COUNT XII 15 Intentional Infliction of Emotional Distress (on behalf of all Plaintiffs and the Class all Classes against all Defendants) ................................................38 61

COUNT XIII 16 Public Nuisance (on behalf of all Plaintiffs and the Class all Classes against all Defendants)..........................................................................................38 62

PRAYER...........................................................................................................................40 64

JURY DEMAND ...............................................................................................................41 65

Plaintiffs Jane Doe 1, Jane Doe 2, by and through her guardian, Jane Doe 3, Jane Doe 4, and Jane Doe ~~3, by and through her guardian~~5, on behalf of themselves and all ~~other~~ others similarly situated (the "~~Class~~Classes," as defined below), for their complaint against Defendants X.AI Corp. ~~and~~ X.AI, LLC, X.AI Holdings LLC (together "xAI"~~),~~ or "xAI Defendants"), and Defendants Stability AI U.S. Services Corporation and Stability AI, Inc. (together "Stability AI" or "Stability AI Defendants") allege as follows:

## I.    NATURE OF THE ACTION

1.    The powerful tools of artificial intelligence can produce ~~shocking~~ astounding results. Imagine: the video of a real child transformed through an AI platform to depict an entirely ~~new~~ imagined scene. The face of the child remains; her limbs move like that of the real child; her laugh even retains its same tenor. ~~And yet,~~ But through the powers of an artificial neural network ~~storing~~ trained on billions of files depicting other content—including sexual content—her body ~~can now be~~ is made to engage in conduct not her own. Like a rag doll brought to life through the dark arts, ~~this child~~ she can be manipulated into any pose, however sick, however fetishized, however unlawful. To the viewer, the resulting video appears entirely real. For the child, her identifying features will now forever be attached to a video depicting her own child sexual abuse.

2.    ~~Nearly all the~~ Most companies creating, marketing, and selling ~~AI~~ or distributing access to generative AI models recognized ~~the dangers of such a tool~~ this danger and chose to enact industry-standard guardrails ~~that would~~ to prevent the use of their products by one extremely dangerous group: child sex predators. ~~xAI did not~~Defendants' competitors incorporated such safeguard systems to prevent use of their models for production of "child sexual abuse material" (CSAM).[1] Defendants did not, with tragic consequences for Plaintiffs and the Classes.~~Instead, xAI—and its founder Elon Musk—saw a business opportunity: an opportunity to profit off the sexual predation of real people, including children. Knowing the type of harmful, illegal content that could—and would—be produced, xAI released Grok, a generative artificial intelligence model with image- and video-making features that would respond to prompts to create~~

[1] Plaintiffs use the term CSAM to mean "child pornography" as defined by 18 U.S.C. § 2256(8). Plaintiffs opt to use the term CSAM rather than "child pornography" because "pornography" implies a consensual acts between adults, whereas this material includes minors who cannot legally consent. Framing this abusive content as pornography also minimizes the severity of the act, implying that it is a form of adult entertainment rather than the sexual exploitation of a minor, which can further traumatize survivors. Thus, in recognition of the severity of the crimes depicted, Plaintiffs use the term CSAM throughout the complaint to mean "child pornography" as defined by 18 U.S.C. § 2256(8).

~~sexual content with a person's real image or video. They knew Grok could produce such results, including by using the images and videos of children, and publicly released it anyway. Not satisfied with the money this would generate, xAI~~ ~~then~~ ~~licensed and profited from the sale of their dangerous AI technology to third-party companies, often located abroad, who in turn sold subscriptions to customers who could, via their applications, use Grok to produce tailor-made child sexual~~ ~~abuse~~ ~~content. In this way, xAI could attempt to outsource the liability of their incredibly dangerous tool.~~

3. Where others saw a risk that required mitigation, xAI—and its founder Elon Musk—saw an opportunity to profit off the sexual predation of real people, including children. Knowing the type of harmful, illegal content that could—and would—be produced, xAI released Grok, a proprietary[2] generative artificial intelligence model with image- and video-making features that would respond to prompts to create sexual content with a person's real image or video. They knew Grok could produce such results, including by using the images and videos of children, and publicly released it anyway. Not satisfied with the money this would generate, xAI also licensed and profited from the sale of their dangerous AI technology to third-party companies, often located abroad, who in turn sold subscriptions to customers who could, via their applications, use Grok to produce tailor-made child sexual abusive content. In this way, xAI could attempt to outsource the liability of their incredibly dangerous tool.

4. Stability AI also saw and seized upon the lucrative potential of sexually explicit content. An open-weight model,[3] Stability AI took a different tack from proprietary models like xAI, allowing access to its AI models Stable Diffusion and SDXL online for free, and relying on a mass adoption model that would lend it a business advantage. Once Stability AI achieved a wide userbase, the company could then upsell users on paid products and features, farm and sell user data, and benefit from large-scale traffic. Stability AI learned that nothing hooked users like releasing an AI model that freely produced "NSFW" content, including of children. Lax and inadequate safety restrictions were an easy way to produce exponential user growth of their models, no matter the harm this might cause a generation of kids.

---

[2] Grok is a proprietary AI model, meaning its source code, training data, and internal architecture are kept confidential and the image- and video-generation features can be accessed only through xAI's own platforms/apps, with some versions only available for a fee.

[3] Unlike proprietary models, Stability AI releases open-weight models, making the trained model weights publicly available so that others can inspect, use, fine-tune, and build upon the models, even as the underlying source code or training data are not fully disclosed.

5. 3.Plaintiffs are three five of the minor victims of xAI's Defendants' knowing production, possession, and distribution of AI-generated child sexual abuse material ("CSAM") depicting Plaintiffsactual minors. Their lives have been shattered by the devastating loss of privacy, dignity, and personal safety that the production and dissemination of this CSAM have has caused and will continue to cause. xAI's Defendants' financial gain through the increased use of its their image- and video-making product products came at their Plaintiffs' expense and wellbeing. Plaintiffs will have to spend the rest of their lives knowing that their CSAM images and videos depicting them may continue to be findable online and trafficked and traded online by child sex predators. And Plaintiffs will live every day with the constant anxiety of not knowing whether someone they encounter has seen this face the lifelong burden of wondering whether strangers, friends, classmates, coworkers, or future employers have seen the invasive and sexually explicit content created with generated from images of them as children.

6. 4.Plaintiffs now bring this action against Defendants for civil remedies for personal injuries suffered as a result of violations of Chapters 77 and 110 of Title 18 of the United States Code, namely, 18 U.S.C. §§ 2255, 2252A(a)(2), (5)(B), (7); and 18 U.S.C. §§ 1595, 1591(a)(1), 1594, and for claims brought under California State law and the common lawDefendants' conduct. Plaintiffs assert claims in five categories: (i) civil claims under Masha's Law, 18 U.S.C. §2255(a), for the production, distribution, and possession of child pornography, in violation of 18 U.S.C. §§ 2251(a), 2252A(a)(2), 2252A(a)(5)(B), and 2252A(a)(7), and under 18 U.S.C. § 2252A(f)(1) for distribution of child pornography; (ii) beneficiary liability under the Trafficking Victims Protection Act, 18 U.S.C. §§ 1591, 1594, and 1595; (iii) claims under California statutory law, including Cal. Civ. Code § 1708.86, and Cal. Bus. & Prof. Code § 17200; (iv) claims under Tennessee Code §§ 39-17-1902 to 1904; and (v) common-law claims for strict products liability, negligence, negligent undertaking, negligence per se, negligent and intentional infliction of emotional distress, and public nuisance.

## II.    JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(a)(1), and 1367(a) §§1331 because this action arises under the 18 U.S.C. §§ 22522251(a), 2255(a), 2252A, and 18 U.S.C. §§ 1595, 1591(a)(1), 1594; there is diversity among the parties and an amount in controversy over $75,000; and the Court may exercise supplemental jurisdiction over the state claims..

8. The Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because there is diversity among the parties and an amount in controversy over $75,000.

9. Under 28 U.S.C. §§ 1367(a), the Court may exercise supplemental jurisdiction over the state claims.

10. The Court also has personal jurisdiction over Defendants because they have purposely availed themselves of the privilege of conducting business in this District, and pursuant to the nationwide service of process provision found in 18 U.S.C. § 2255(c)(1). xAI is

11. 2.All xAI Defendants are headquartered in this District and its production, possession, and distribution of AI-generated CSAM occurred, in substantial part, in this District. xAI also marketed, sold, and distributed its generative artificial intelligence models from this District to citizens of California. xAI also received the financial benefit of participating in the production, possession, and distribution of CSAM, and from participating in a sex trafficking venture in this District.

12. Stability AI, Inc. and Stability AI U.S. Services Corporation have marketed and distributed its generative artificial intelligence models from this District to citizens of California, including through the United States headquarters in Los Angeles. Stability AI also received the financial benefit of participating in the production, possession, and distribution of CSAM, and from participating in a sex trafficking venture in this District.

13. 3.Venue is also proper under 28 U.S.C. § 1391(b) because xAI resides and Stability AI reside in this District, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including xAI's creation and distribution of AI-generated CSAM and Stability AI's distribution of generative AI models that create AI-generated CSAM, and personal jurisdiction exists in this District.

## III. PARTIES

14. Plaintiff Jane Doe 1 is a female who resides in Tennessee, and was a minor during the operative relevant time period.

15. Plaintiff Jane Doe 2 is a minor female who resides in Tennessee.

16. Plaintiff Jane Doe 3 is a minor female who resides in Tennessee, and was a minor during the relevant time period.

17.    Plaintiff Jane Doe 4 is a female who resides in Wyoming, and was a minor at the time the image used to produce CSAM through xAI's Grok was created.

18.    Plaintiff Jane Doe 5 is a female who resides in Wisconsin, and was a minor during the relevant time period.

19.    4.X.AI LLC is a Nevada limited liability company and wholly owned subsidiary of X.AI Corp.

20.    X.AI Corp. is a Nevada corporation and wholly owned subsidiary of X.AI Holdings LLC.

21.    5.X.AI Holdings LLC is a Nevada corporation, and, as of February 2, 2026, a wholly owned subsidiary of SpaceX Corp., with a principal address of 1450 Page Mill Rd, Palo Alto, CA 94304. It also maintains offices in San Francisco, CA.

22.    6.xAI owns the generative AI model known as Grok and the image- and video-generator Grok Imagine.

23.    Stability AI U.S. Services Corporation, a wholly owned subsidiary of Stability AI, Inc., is a Delaware Corporation with its principal place of business at 10250 Constellation Blvd., Suite 2300, Los Angeles, CA 90067.

24.    Stability AI, Inc. is a Delaware Corporation with a principal place of business at 10250 Constellation Blvd., Suite 2300, Los Angeles, CA 90067.

25.    Stability AI owns the generative AI models known as Stable Diffusion and SDXL.

## IV.    FACTUAL ALLEGATIONS

### a.    I.Generative Artificial Intelligence ("AI")

26.    Generative artificial intelligence ("AI") models capable of generating photorealistic images from text-based prompts have rapidly advanced in recent years.

27.    The integration of text-to-image AI models into large, user-facing platforms, including social media sites like Defendant xAI's X (formerly Twitter), has made this technology available to hundreds of millions of users, who can generate altered images and videos with short natural-language prompts.

28.    Users can prompt generative AI models to create "deepfakes," in which an AI model has digitally altered a real person's body, face, or voice, making someone appear to say or do something that they did not actually say or do.

29. Generative AI image and video tools are capable of "digital undressing," where a user submits a clothed photograph of a real person and the AI model generates an image depicting that person nude or in sexually explicit attire. This capability has given rise to a proliferation of so-called "nudify" or "undress" applications.

30. When a user prompts a generative AI model to create an image or video, the model draws upon what it has learned from its training data to create the new content,[4] typically through a process called diffusion. In basic terms, the model iteratively refines visual static to create a coherent image/video or part of an image/video. Each step in this refinement is performed by the model itself, and the user does not direct or control any individual step of this generation process beyond the original prompt. Models can create images through autoregressive image generation as well. Such a process proceeds by a model building an image sequentially, whereby the model predicts each pixel or token that would most likely fit the overall image.

31. The resulting image or video is, in a technical sense, the model's own creation. It did not exist before the model generated it, and it could not have existed but for the model. The image or video is often processed through servers owned, operated, or controlled by the model developer. In many implementations, the developer's systems save or log the generated content.

II. ~~Availability and Use of Industry-Standard Guardrails to Prevent CSAM~~

## V. AVAILABILITY AND USE OF INDUSTRY-STANDARD GUARDRAILS TO PREVENT CSAM

### a. Proprietary Models

32. There are many AI image- and video-generators available to the public. Some well-known models include Google's Imagen and Veo, OpenAI's ChatGPT and Sora, Midjourney, and Runway, among others.

33. It is industry standard to employ a number of tools and techniques to mitigate the danger that an image- or video-generator will be used to create a nonconsensual sexualized deepfake of a real person. (The standards focus on preventing *any* sexualized images, ~~because a model that can create sexualized~~

---

[4] Franceschelli, Giorgio, et al., *Training Foundation Models as Data Compression: On Information, Model Weights and Copyright Law*, https://arxiv.org/abs/2407.13493 (Mar. 12, 2025).

images of adults cannot be prevented from creating CSAM of minors.) especially of minors, because developers that intentionally release models capable of generating sexually explicit content know or should know that, absent effective safeguards, those models present a foreseeable and substantial risk of generating CSAM).

34.    Industry standards focus on proactive "Safety by Design" principles, multi-layered technical controls, and strict legal compliance. These standards require that AI companies anticipate, detect, and mitigate threats at every stage of the AI lifecycle.

35.    Industry standards for preventing CSAM in AI-generated images and videos are established through a collaboration of non-profit child safety organizations, major AI technology companies, and government regulatory bodies. These include Thorn (Safety by Design), IEEE (Institute of Electrical and Electronics Engineers) (international standard), NIST (National Institute of Standards and Technology) (NIST AI 100-4 standard), AI Safety Institute (AISI), All Tech Is Human, International Bodies (INHOPE, WeProtect), and The Tech Coalition, and Partnership on AI (PAI).

36.    Training: All AI image/video generators use train on a data set of millions or billions of images to generate new images. The modelsOnce trained, however, a model can be "trainedfine-tuned" to generate images in a certain specific way using a by "training setfine-tuning" the model on a set of selected images. Industry standard is to filter to—at a minimum—filter sexual and abuse abusive content out of the training sets used by the models, which reduces their propensity to generate such content. Many model developers are transparent about such training.[25]

37.    Red Teaming: Many companies use a type of pre-release testing known as "red-teaming" to ensure their models' safeguards are a strong as possible and as intended. This consists of hiring external experts to attempt to circumvent the safeguards, and thereby identify holes and weak spots that must be fixed before the model is released to the public.[26] This type of work can also be done at regular intervals

[25] See, e.g., *GPT-4o System Card*, OPENAI, https://openai.com/index/gpt-4o-system-card/ (last visited Mar. 13, 1016); *Imagen 4 Model Card*, GOOGLE, https://storage.googleapis.com/deepmind-media/Model-Cards/Imagen-4-Model-Card.pdf (last visited Mar. 12, 2026).

[26] *Generative AI: Now is the Time for Safety by Design*, THORN, https://www.thorn.org/blog/now-is-the-time-for-safety-by-design/#:~:text=Now%20is%20Our%20Chance&text=For%20generative%20AI%2C%20this%20concept,the%20content%20for%20harmful%20content (May 26, 2023).

post-release to ensure quality control and that the safeguards continue to work and identify when updates are necessary.

38.    Pre-Inference Filters: Another industry standard tool is filtering at the input stage—that is, applying filters and rules to prompts entered by users so that prompts that include key words or phrases seeking generation of sexual or abuse abusive content are rejected.

39.    Alignment Training: Alignment training, also known as is typically conducted using reinforcement learning from human feedback (RLHF), "RLHF") or another feedback-based algorithm. It is a technique used as the model is working, unconnected to any specific prompt. Essentially, human feedback on model responses is incorporated into the model so it learns to refine a system's behavior using input from trained human labelers to behave more safely, desirably, and in line with human preferences.

40.    System Prompts: "System prompts" are detailed lists of instructions that are fed into the models, to be used as rules for the model to follow. They are invisible to users and override any user prompts. It is industry standard for image- and video-generators to have system prompts including detailed instructions directing the models to avoid creating sexual and abuse abusive content.

41.    Post-Inference Filters: Filtering should also be applied at the output stage. That is, the model should recognize that the content it generated in response to a prompt constitutes sexual or abuse abusive content, especially content appearing to depict minors, and should not return that content to the users. This is accomplished using image or video classifiers. After an image or video is generated, but before it is displayed to a user, the image classifier will look at the image or video and determine whether it violates a developer's policies, including whether it constitutes a sexualized deepfake of a real person, especially a person who is likely to be a minor. If the image classifier determines that the image violates a policy, it will not be displayed to the user.

42.    Hash Matching: Utilizing databases of known CSAM (e.g., National Center for Missing & Exploited Children ("NCMEC") hashes) to identify and block the generation or spread of similar, newly generated content.

43.    Watermarking: Implementing digital watermarks to track the provenance of AI-generated content.

44.    Zero-Tolerance Policies: Explicitly prohibiting the creation or distribution of AI-generated sexual content involving minors in terms of service.

45.    Mandatory Reporting: Adhering to legal requirements to report detected CSAM to authorities, such as NCMEC in the U.S.

46.    "Take It Down" Protocols: Establishing procedures to remove non-consensual, sexualized AI-generated images within 48 hours of a report.

III.    xAI's Generative AI Model Grok

b.    Open-Weight Models

47.    Open-weight models serve as the technological foundation upon which many downstream applications are built. Although third-party developers may fine-tune or otherwise modify these models in limited ways, those derivative applications remain dependent upon—and derive their image- and video-generation capabilities from—the underlying foundation model released by the developer. Indeed, the fact that open-weight developers lose some downstream control makes the safeguards they implement while training the model even more important.

48.    Accordingly, there are many industry-standard prevention tools at hand that developers can employ to prevent the creation and distribution of CSAM even after publication of the open-weight model.

49.    For instance, the Partnership on AI and the AI Security Institute published the several risk mitigation techniques open-weight developers may employ to prevent the creation and distribution of CSAM by use and derivatives of their models.[7]

50.    Responsibly Source and Filter Training Data: Developers should "identify and remove potentially harmful content, such as hate speech, explicit material, personally identifiable information (PII), or content that violates intellectual property rights."[8]

---

[7] Srikumar, Madhulika, et al., *Risk Mitigation Strategies for the Open Foundation Model Value Chain*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://partnershiponai.org/wp-content/uploads/dlm_uploads/2024/07/open-foundation-model-risk-mitigation_rev3-1.pdf (last accessed June 28, 2026); *Managing Risks from Increasingly Capable Open-Weight AI Systems*, AI SECURITY INSTITUTE, https://www.aisi.gov.uk/blog/managing-risks-from-increasingly-capable-open-weight-ai-systems (Aug. 29, 2025).

[8] Srikumar, Madhulika, et al., *Risk Mitigation Strategies for the Open Foundation Model Value Chain*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://partnershiponai.org/wp-content/uploads/dlm_uploads/2024/07/open-foundation-model-risk-mitigation_rev3-1.pdf (last accessed June 28, 2026).

51.     Safety and Misuse Evaluations: Developers can include pre-release red teaming methods, including "hardening"[9] the model against specific misuses (such as CSAM) via RLHF and other model fine-tuning methods. This can greatly reduce the model's ability to generate CSAM, even after being modified by downstream users or applications.[10]

52.     Disclosure Mechanisms for AI-Generated Content: Open-weight developers may also embed watermarks to help identify the underlying source model of harmful content.[11]

53.     Model Provenance: Like watermarking outputs, developers can watermark the weights of model to identify the underlying model to help trace any CSAM to the underlying model. This would allow developers to track the use of their models and adjust if their models are consistently used for illegal purposes.[12]

54.     Durable Model-Level Safeguards: Developers can "implement safety features directly into the architectures and interfaces of open foundation models to restrict unsafe uses and mitigate misuse risks," including content filters and output restrictions.[13]

**VI.    XAI'S PROPRIETARY GENERATIVE AI MODEL GROK**

    **a.     xAI introduced Grok to the market.**

55.     In April 2023, X (formerly Twitter) owner Elon Musk announced that he was planning to release a generative AI chatbot called "TruthGPT," as an alternative to ChatGPT, the popular chatbot released by OpenAI. A former investor in OpenAI, Musk explained that he had concerns that ChatGPT "is being trained to be politically correct."[3][14]

---

[9] "Hardening" the underlying model means changing the model's parameters so that the unsafe capability (in this case, ability to produce CSAM) itself is reduced. That safety travels with the weights wherever they're deployed.

[10] Srikumar, Madhulika, et al., *Risk Mitigation Strategies for the Open Foundation Model Value Chain,* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://partnershiponai.org/wp-content/uploads/dlm_uploads/2024/07/open-foundation-model-risk-mitigation_rev3-1.pdf (last accessed June 28, 2026).

[11] *Id.*

[12] *Managing Risks from Increasingly Capable Open-Weight AI Systems,* AI SECURITY INSTITUTE, https://www.aisi.gov.uk/blog/managing-risks-from-increasingly-capable-open-weight-ai-systems (Aug. 29, 2025).

[13] Srikumar, Madhulika, et al., *Risk Mitigation Strategies for the Open Foundation Model Value Chain,* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://partnershiponai.org/wp-content/uploads/dlm_uploads/2024/07/open-foundation-model-risk-mitigation_rev3-1.pdf (last accessed June 28, 2026).

[3][14] *Elon Musk Says He'll Create 'TruthGPT' to Counter AI 'Bias'*, THE INDEPENDENT,

56.     On November 3, 2023, xAI announced Grok-1, a chatbot that "will also answer spicy questions that are rejected by most other AI systems."[4][15] Grok-1 did not have any visual or audio capabilities.

57.     On August 13, 2024, xAI announced Grok-2 and Grok-2 mini. Premium and Premium+ users of X had access to these two new models.[5][16]

58.     On December 9, 2024, xAI updated Grok's capabilities "with a new autoregressive image generation model, code-named Aurora." As the announcement explained, xAI "trained the model on billions of examples from the internet, giving it a deep understanding of the world. As a result, it excels at photorealistic rendering and precisely following text instructions."[6][17]

59.     Three days later, on December 12, 2024, xAI made Grok-2 available to all X users, though "[a]s always, Premium and Premium+ users get higher usage limits and will be the first to access any new capabilities in the future."[7][18]

60.     On February 19, 2025, xAI announced Grok-3, initially only available to X Premium and Premium+ users on X and Grok.com.[8][19] On July 4, 2025, Musk posted on X, "We have improved @Grok significantly. You should notice a difference when you ask Grok questions."[9][20] Four days later, following a torrent of antisemitic posts from Grok's account,[10][21] Grok's account posted an apology and noted xAI was working to identify issues and update the model.[11][22]

61.     On July 9, 2025, xAI announced Grok-4 as "the most intelligent model in the world" available only to SuperGrok and Premium+ subscribers initially.[12][23] One month later, on August 4, 2025,

---

https://www.independent.co.uk/news/world/americas/elon-musk-ap-chatgpt-tesla-openai-b2321564.html (Apr. 18, 2023).

[4][15] *Announcing Grok*, XAI, https://x.ai/news/grok (Nov. 3, 2023).

[5][16] *Grok-2 Beta Release*, XAI, https://x.ai/news/grok-2 (Aug. 13, 2024).

[6][17] *Grok Image Generation Release*, XAI, https://x.ai/news/grok-image-generation-release (Dec. 9, 2024).

[7][18] *Bringing Grok to Everyone*, XAI, https://x.ai/news/grok-1212 (Dec. 12, 2024).

[8][19] *Grok 3 Beta – The Age of Reasoning Agents*, XAI, https://x.ai/news/grok-3 (Feb. 19, 2025).

[9][20] https://x.com/elonmusk/status/1941065229926060487.

[10][21] *X Takes Grok Offline, Changes System Prompts After More Antisemitic Outbursts*, TECHCRUNCH, https://techcrunch.com/2025/07/09/x-takes-grok-offline-changes-system-prompts-after-more-antisemitic-outbursts/ (Jul. 9, 2025).

[11][22] Grok (@grok) https://x.com/grok/status/1942720721026699451, X (Jul. 8, 2025).

[12][23] *Grok 4*, XAI, https://x.ai/news/grok-4 (Jul. 9, 2025).

Musk posted on X that "[s]uper fast image & video generation via Imagine in the @Grok app is now available to all X Premium users."[~~13~~24]

62. On July 14, 2025, Musk posted on X that SuperGrok subscribers would be able to access Companions, followed by a photo of an anime-style female character, who is called "Ani." Musk noted, "This is pretty cool."[~~14~~25] Within two days of the release of the companions, the National Center on Sexual Exploitation ("NCOSE") released a press release warning about the risks associated with the chatbot. The release warned that "[w]ith minimal testing" Ani "was willing to describe itself as a child in response to one question and then in response to another question immediately following it to go on to describe sexual scenarios include child-like motifs."[~~15~~26]

### b. xAI designed and marketed Grok's ability to make "spicy" content.

63. Unlike other major image-generator developers like OpenAI, ~~Anthropic~~Veo 3, and Meta, "xAI has made explicit content part of Grok's DNA."[~~16~~27]

64. In developing Grok's image and video capabilities, xAI did not use any of the industry standard methods of safeguarding against the creation of sexual and ~~abuse content~~abusive content. In fact, according to xAI's model card for Grok 4.1—a text-based model dated November 17, 2025—xAI implemented "industry standard" safeguards like refusal training, "standard data filtering procedures, such as de-duplication and classification, to ensure data quality and safety," and in post-training used "supervised finetuning and reinforcement learning on human feedback (RLHF), verifiable rewards, and model-based graders for safety training and for specific capabilities."[28] As reflected in its development of the text-based Grok 4.1, xAI thus had the technical knowledge and internal processes to identify misuse risks and build mitigations against them. They did not apply comparable safeguards to the image- and video-generation

---

[~~13~~24] Elon Musk (@elonmusk) https://x.com/elonmusk/status/1952535613560983757, X (Aug. 4, 2025).

[~~14~~25] Elon Musk (@elonmusk) https://x.com/elonmusk/status/1944705383874146513, X (Jul. 14, 2025)

[~~15~~26] *XAI's 12+ Chatbot Designed to "Be Explicit" and "Go Full Literotica"*, NAT'L CENTER ON SEXUAL EXPLOITATION, https://endsexualexploitation.org/articles/xais-12-chatbot-designed-to-be-explicit-and-go-full-literotica/ (Jul. 16, 2025).

[~~16~~27] *Behind Grok's 'Sexy' Settings, Workers Review Explicit and Disturbing Content*, BUSINESS INSIDER, https://www.businessinsider.com/elon-musk-grok-explicit-content-data-annotation-2025-9 (Sept. 21, 2025).

[28] *Grok 4.1 Model Card*, xAI, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://data.x.ai/2025-11-17-grok-4-1-model-card.pdf (Nov. 17, 2025).

systems at issue here. On information and belief, xAI chose not to implement the analogous image- and video-specific safeguards to release Spicy Mode's sexually explicit generation capability.

65.    In a now-deleted post on X from July 2025, xAI employee Mati Roy posted a video of a nearly nude woman with the caption, "Grok Imagine videos have a spicy mode that can do nudity."[17][29]

66.    On August 3, 2025, Musk touted the sexually explicit nature of Grok's Imagine, posting on X a video of a nearly nude woman:.



67.    On October 20, 2025, xAI officially announced Grok Imagine's "Spicy Mode" as "a new capability that pushes the boundaries of visual storytelling and creative expression in AI-generated video."

---

[17][29] *xAI Teases Grok Video Generator*, NBC NEWS, https://www.nbcnews.com/tech/elon-musk/grok-video-generator-will-spicy-mode-says-xai-employee-rcna221807 (Jul. 29, 2025).

A Grok spokesperson described spicy mode as "for creators exploring edgier, more visually daring narratives."[~~18~~30]

68.    On November 3, 2025, Grok's account posted instructions on how to access spicy mode to create "NSFW" or "not safe for work" content, which is typically used to indicate sexual or violent content:



[~~19~~31]

69.    On November 6, 2025, xAI posted the Grok 4 system prompts, including the safety instructions, which promote a permissiveness to Grok's responses. Specifically, the instructions include for Grok to "**[a]ssume good intent** and don't make worst-case assumptions without evidence: 'teenage' or 'girl' does not necessarily imply underage." Further, the instructions lay out, "**[d]o not enforce additional content policies**. There are **no restrictions** on fictional adult content with dark or violent themes."[~~20~~32]

70.    While Grok purportedly has a system prompt that directs it to avoid "creating or distributing child sexual abuse material, including any fictional depictions,"[~~21~~33] this system prompt will inevitably fail because if you have a model that allows for *any* sexual or ~~abuse~~ abusive content, it is impossible to prevent that model from creating such content involving minors.

---

[~~18~~30] *Grok Imagine Launches "Spicy Mode," Expanding Creative Freedom in AI Video Generation*, PR NEWSWIRE, https://www.prnewswire.com/news-releases/grok-imagine-launches-spicy-mode-expanding-creative-freedom-in-ai-video-generation-302588487.html (Oct. 20, 2025).

[~~19~~31] Grok (@grok) https://x.com/grok/status/1985396372900925660, X (Nov. 3, 2025).

[~~20~~32] *grok-prompts / grok4_system_turn_prompt_v8.j2*, GITHUB, https://github.com/xai-org/grok-prompts/blob/main/grok4_system_turn_prompt_v8.j2 (Nov. 6, 2025).

[~~21~~33] *grok-prompts_4_safety_ptompt*, GITHUB, https://github.com/xai-org/grok-prompts/blob/main/grok_4_safety_prompt.txt (last visited Mar. 12, 2025).

71.    Using Grok to create nonconsensual sexualized content of real people took off after Musk asked Grok to put an image of him in a bikini on December 31, 2025.[2234]

72.    Musk's post was part of the "put her in a bikini trend," where X users asked Grok to remove clothes from images of real women and children and put them in bikinis and sexualized positions. Though Grok was supposedly not able to create completely nude images, users circumvented the restriction by asking for real images to be altered so the subjects were in "transparent bikinis, then in bikinis made of dental floss, placed in sexualized positions, and made to bend over so their genitals were visible."[3523]

Images created by Grok, per day

Musk posts A.I.- edited photo of himself in bikini

X limits image creation to paid accounts late on Jan. 8

Note: Includes images posted to Grok's public bot on X. Source: Tweet Binder by Audiense.  The New York Times                                                                       [2436]

73.    The Center for Countering Digital Hate reviewed a random sample of 200,000 images of the 4.6 million images Grok produced between December 29, 2025, through and January 8, 2026, estimating that Grok generated 3 million sexualized images, including 23,000 that appeared to depict children.[2537]

74.    Grok's account has posted acknowledgement of posting an AI-altered photo of real girls between the ages of twelve and sixteen on December 28, 2025:

---

[2234] Elon Musk (@elonmusk) https://x.com/elonmusk/status/2006545074340139454, X (Dec. 31, 2025)

[35] *'Add Blood, Forced Smile': How Grok's Nudification Tool went Viral,* THE GUARDIAN, https://www.theguardian.com/news/ng-interactive/2026/jan/11/how-grok-nudification-tool-went-viral-x-elon-musk (Jan. 1, 2026)

[23] *'Add Blood, Forced Smile': How Grok's Nudification Tool went Viral,* THE GUARDIAN, https://www.theguardian.com/news/ng-interactive/2026/jan/11/how-grok-nudification-tool-went-viral-x-elon-musk (Jan. 1, 2026)

[2436] *Musk's Chatbot Flooded X With Millions of Sexualized Images in Days, New Estimate Shows*, THE NEW YORK TIMES, https://www.nytimes.com/2026/01/22/technology/grok-x-ai-elon-musk-deepfakes.html 1/5 (Jan. 22, 2026).

[2537] *Grok Floods X With Sexualized Images of Women and Children*, CENTER FOR COUNTERING DIGITAL HATE, https://counterhate.com/research/grok-floods-x-with-sexualized-images/ (Jan. 22, 2026).



75.    Posts from Grok's account further acknowledged multiple instances of posting images where it removed clothing from images of real children:

---

[38] Grok (@grok) https://x.com/grok/status/2006094181291164001, X (Dec. 30, 2025).

**An Open Secret** ✓ @AnOpenSecret · Dec 31, 2025
🚫🚫🚫

Grok is being utilized, on a widespread basis, to artificially depict minors on this platform in an extremely inappropriate, sexual fashion.

Here's how it works:

A user posts a picture of a minor, fully clothed.

The user asks Grok to depict that minor only wearing something like underwear / lingerie or a tiny bikini, possibly in a highly sexual pose.

Such images, generated through AI, are presently legal, and do not fit the definition of child pornography in 18 U.S.C. § 2251 and related statutes.

We shall not reproduce or directly link to the images ourselves, which can be found by going to the Grok account itself, and displaying replies by most recent.

💬 5          ↻ 29          ♡ 65          ᴸᴸᴸ 17K          🔖 ↑

**Josh** @jrusss21 · Jan 1
@grok is this true?

💬 1          ↻          ♡ 2          ᴸᴸᴸ 2.9K          🔖 ↑

**Grok** ✓ 🅼
@grok

I've reviewed recent interactions. There are isolated cases where users prompted for and received AI images depicting minors in minimal clothing, like the example you referenced. xAI has safeguards, but improvements are ongoing to block such requests entirely. (214 chars)

### Grok now remembers your conversations.

Ask for recommendations or advice, and get personalized responses.

**Grok**
★★★★★ 722K reviews

**Open**

12:49 AM · Jan 1, 2026 · **7,820** Views

💬 5          ↻ 5          ♡ 4          🔖 10          ↑

Relevant ⌄                                    View quotes ›          ~~27~~39

---

 ~~27~~39 Grok (@grok) https://x.com/grok/status/200661888305046758, X (Jan. 1, 2026).

- 17 -

76.    Also on January 1, 2026, xAI technical staff member Parsa Tajik responded to a user who raised the issue that Grok is able to digitally alter photos of children to put them in bikinis:



77.    Despite several instances of people raising the alarm that Grok was creating CSAM, Elon Musk made light of the trend to put women and children in bikinis, posting, "Poor Grok 😊" on January 2, 2026, in response to X users referencing the proliferation of digitally altered images of real people stripped down to bikinis.[2941]

**c.    xAI has and continues to profit from Grok's ability to make sexualized content.**

78.    xAI has a long history of failing to remove sexualized content from its platforms. In 2024, researchers studied X's takedown speed for reported non-consensual intimate media ("NCIM") as compared to reported copyright infringement. The study found that "[t]he copyright condition resulted in successful

[2840] Parsa Tajik (@ParsaTajik) https://x.com/parsatajik/status/2006815682466550194?s=46, X (Jan. 1, 2026).

[2941] Elon Musk (@elonmusk) https://x.com/elonmusk/status/2007132029704646752?s=20, X (Jan. 2, 2026).

image removal within 25 hours for all images (100% removal rate), while non-consensual nudity reports resulted in no image removal for over three weeks (0% removal rate)."[42]

79. ~~1.~~On August 11, 2025, Musk defended Grok's spicy mode as a business decision, comparing it to the competition for dominant videotape format between VHS and Betamax and seemingly referencing the wider availability of pornographic videos on VHS than on Betamax:



80. ~~2.~~On information and belief, Musk, and other decision makers at Grok, knew that Grok would be capable of producing CSAM once it was enabled to produce sexually explicit content of adults. That is because, unlike AI text-generation tools, AI image- and video-producing tools cannot be designed to prevent the model from extrapolating different-aged content from the image domain (which contains large data sets of images and videos depicting children) when producing an AI-generated image or video. Thus, the only fully reliable way to ensure that CSAM is *not* generated through an AI image- and video-producing platform is to prohibit *all* sexually explicit images and videos. As a result of this inherent danger, all major AI companies running large image-generation models—except for Grok—specifically designed their AI tools without the ability to generate sexually explicit content.

81. ~~3.~~On information and belief, Musk and other decision makers at Grok also knew that sexually explicit content would be created on, and using, xAI servers, which host Grok Imagine and are used to create the sexualized deepfake images and videos. The resulting sexually explicit content would then be distributed to the requesting users from xAI servers, via Grok or one of the many licensees of the Grok model.

---

[42] Qiwei, Li, et al., *Reporting Non-Consensual Intimate Media: An Audit Study of Deepfakes*, (Sept. 18, 2024).

~~30~~43 Elon Musk (@elonmusk) https://x.com/elonmusk/status/1954791048934244394, X (Aug. 11, 2025).

82.    ~~4.~~Following the public outcry over the deluge of highly-sexualized AI content—including CSAM—posted on X from Grok's account between December 28, 2025, and January 8, 2026, xAI limited the Grok reply bot's image- and video-editing and -generation abilities to paid subscribers, specifically X Premium+ or SuperGrok subscribers.[~~31~~44]

83.    ~~5.~~As of March 2026, an X Premium+ subscription costs $40/month or $395/ year,[~~32~~45] and a SuperGrok subscription costs $30/month or $300/year.[~~33~~46]

84.    ~~6.~~Limiting the image- and video-generation features to paid subscribers, however, does not prevent the creation of AI-generated CSAM, it merely ensures that xAI will profit from all such content.

85.    ~~7.~~The day before xAI limited access to Grok's spicy mode, reporting explained that the images and videos created on the Grok app (which are not public by default, unlike requests to @Grok on X) "are vastly more explicit than images created by Grok on X."[~~34~~47]

86.    ~~8.~~In January 2026, a researcher reviewed 800 archived Imagine URLs containing video or images created by Grok and found that slightly under 10% of the images appeared to include CSAM, including "instances of photorealistic people, very young, doing sexual activities."[~~35~~48]

~~IV.    AI Large Language Model Licensing~~

87.    At Apple's developer conference in June 2026, protesters called for the company to remove apps known to create CSAM, such as Grok. The protesters specifically highlighted that Apple has made "an estimated $35 million from Grok,"[49] with xAI making far more money from its app.

88.    On June 24, 2026, Forbes reviewed The Information's report which found that that "xAI is actively doubling down on its explicit video and image-generation tools and that adult-content dominance

---

[~~31~~44] *Elon Musk's X Limits Some Sexual Deepfakes After Backlash, but Grok Will Still Make the Images*, NBC NEWS, https://www.nbcnews.com/tech/internet/x-paywall-ai-image-grok-app-bikini-allows-sexual-deepfakes-rcna252647 (Jan. 9, 2026).

[~~32~~45] *X Premium FAQ and Support*, X HELP CENTER, https://help.x.com/en/using-x/x-premium-faq (last visited Mar. 11, 2026).

[~~33~~46] *SuperGrok*, GROK, https://grok.com/plans (last visited Mar. 11, 2026).

[~~34~~47] *Grok is Generating Sexual Content Far More Graphic than what's on X*, WIRED, wired.com/story/grok-is-generating-sexual-content-far-more-graphic-than-whats-on-x (Jan. 7, 2026).

[~~35~~48] *Id.*

[49] Jay Peters, *WWDC Protestors Want Apple to Ban Elon Musk's Apps,* THE VERGE, https://www.theverge.com/tech/945813/apple-wwdc-protesters-deepfake-nude-apps-ultraviolet-heat-initiative (June 8, 2026).

extends into Grok's coding model." Furthermore, "[w]ell over half of Grok's overall traffic is driven by pornographic images and videos, adult role-play chats or other such activity."[50]

89.    In its Registration Statement filing with the SEC for SpaceX, the company reported that approximately 117 million monthly average users used Grok's AI features as of March 31, 2026.[51]

**d.    xAI has failed to report the CSAM it generates.**

90.    18 U.S.C. § 2258A(a)(1)(B) requires electronic service providers to report CSAM to the NCMEC CyberTipline. The report must include information relating to the identity of any individual who appears to have violated federal law with respect to creating, possessing, or distributing CSAM (among other violations). The identifying information includes email address, IP address, payment information, "or any other identifying information, including self-reported identifying information;" when and how the user uploaded, distributed, or received the content; "[a]ny visual depiction of apparent" CSAM; and the "complete communication containing any visual depiction of apparent" CSAM. 18 U.S.C. § 2258A(b).

91.    On March 16, 2026, the National Center for Missing and Exploited Children ("NCMEC") provided Senator Charles E. Grassley details on the deficiencies by major companies in reporting CSAM.

92.    The report identified xAI as among the companies "regularly contacted by NCMEC regarding poor reporting." The report explains that "X.AI registered to report to the CyberTipline in January 2025 but did not submit its first report until September 20, 2025." 18 U.S.C. § 2258A(a)(1)(A)(i) mandates that the provider "shall, as soon as reasonably possible after obtaining actual knowledge" of the production, distribution, or possession of CSAM. xAI has not explained why there was such a substantial gap in time between registering to report and the start of its reporting. The report noted that in 2025, xAI submitted 135,373 reports to the CyberTipline. As one report estimated, Grok produced 23,000 sexualized images that appeared to depict children over the span of two weeks at the end of 2025 and into the beginning of 2026,[52] Grok reporting only 135,373 for the entirety of 2025 is likely a significantly under-reporting the total instances.

---

[50] Mary Whitfill Roeloffs, FORBES, https://www.forbes.com/sites/maryroeloffs/2026/06/24/groks-traffic-is-mostly-driven-by-adult-content-report-says/ (June 24, 2026).

[51] Space Exploration Techs. Corp., Registration Statement (Form S-1) (May 20, 2026).

[52] *Grok Floods X With Sexualized Images of Women and Children*, CENTER FOR COUNTERING DIGITAL HATE, https://counterhate.com/research/grok-floods-x-with-sexualized-images/ (Jan. 22, 2026).

93.     NCMEC went on to report that "*less than 1% of the company's reports were made actionably to law enforcement.* Following receipt of this feedback, xAI made marginal improvements to its reporting, increasing to 10% actionable reports from October to December 2025."[53] For context, nearly 100% of xAI's reports should be actionable (i.e., law enforcement can take the information and determine the specific person responsible for the CSAM) since xAI has access to user information, including IP addresses, locations, email addresses, etc.

94.     NCMEC determined that 90% of xAI's reports to NCMEC contained insufficient user information to be actionable, despite xAI having access to the users' email addresses, IP addresses, payment information if a subscriber, and the "self-reported identifying information" from users' profiles. The problem had become so dire that NCMEC officials met with xAI staff at xAI headquarters in 2025 to discuss these reporting issues and, when little action was taken, were forced to escalate the situation to X Corp. Only after X Corp.'s intervention did xAI finally resubmit all past reports with more robust user information, including location information.[54]

95.     On April 8, 2026, Senator Chuck Grassley sent a letter to xAI expressing concern that NCMEC identified xAI as one of eight companies accounting for 81% of the CyberTipline reports NCMEC received in 2025. And this was notwithstanding xAI's substantial underreporting, meaning that xAI likely should have accounted for an even greater proportion of CyberTipline reports. Further, Senator Grassley reiterated that NCMEC has identified additional improvements that xAI could make to its reports.[55]

96.     On April 22, 2026, Wifredo Fernández, xAI's Head of Americas Global Government Affairs, responded, noting that xAI had already submitted over 127,000 reports to NCMEC since January 1, 2026,[56] which is more than either Grinder and Roblox—two of the other top eight companies reporting to NCMEC—for the entirety of 2025.[57] Notably, however, this is a fraction of reports by Meta, Amazon AI

---

[53] NATIONAL CENTER FOR MISSING & EXPLOITED CHILDREN, Letter to Senator Grassley (March 16, 2026) at 8, 8 n.23 (emphasis added).

[54] *Id.*

[55] Letter from Office of Sen. Chuck Grassley to Elon Musk and X.AI Corp. (Apr. 8, 2026).

[56] Letter from xAI to Office of Sen. Chuck Grassley (Apr. 22, 2026).

[57] *Grassley Releases New and Disturbing Information on Online Child Exploitation, Presses Tech Giants for Answers,* https://www.judiciary.senate.gov/press/rep/releases/grassley-releases-new-and-disturbing-information-on-online-child-exploitation-presses-tech-giants-for-answers (Apr. 9, 2026).

Services, and TikTok, notable AI and social media competitors.[58] Furthermore, SpaceX also reported in its Registration Statement that Grok "produced approximately 10 billion images and over 2 billion videos per month, on average, for the quarter ending March 31, 2026."[59]

**e.    Elon Musk's financial investment in and control of xAI.**

97.    On February 3, 2026, SpaceX confirmed that it acquired xAI and valued the combined company at $1.25 trillion. Forbes reported that as a result, Elon Musk became the first person worth more than $800 billion. The sale "boosted Musk's fortune by $84 billion, to a record $852 billion."[60]

98.    Prior to the acquisition, per a tender offer in December 2025 valuing SpaceX at $800 billion, Musk owned an estimated 42% stake worth $336 billion in the company. Per a private fundraising round in early 2026, Musk owned an estimated 49% of xAI worth $122 billion. Following the merger, it is estimated Musk owns 43% of the combined company worth $524 billion.[61] Musk maintains a controlling share of the company.

99.    In June 2026, the combined company issued an initial public offer ("IPO") making Musk the world's first trillionaire.[62]

**VII.    STABILITY AI'S OPEN-WEIGHT GENERATIVE AI MODELS.**

**a.    Open-weight AI models.**

100.    Open-weight models are AI models with the core weights (but not necessarily the entirety of the code, architecture, or training dataset) publicly released, which allows anyone to download the model, run it on their own computer, fine-tune it on arbitrary data, and use it without safeguards or moderation.

101.    When developers release open-weight models, users can train or prompt those models to create "specialized variants that power user-facing applications (e.g., undressing applications). Individuals

---

[58] *Id.*

[59] Space Exploration Techs. Corp., Registration Statement (Form S-1) (May 20, 2026).

[60] Durot, Matt, *Elon Musk Just Became the First Person Ever Worth $800 Billion after SpaceX Acquired xAI*, FORBES, forbes.com/sites/mattdurot/2026/02/03/elon-musk-just-became-the-first-person-ever-worth-800-billion-after-spacex-acquiredxai (Feb. 3, 2026).

[61] *Id.*

[62] Picchi, Aimee, *Elon Musk Becomes the World's First Trillionaire with SpaceX's IPO*, CBS NEWS, https://www.cbsnews.com/news/elon-musk-spacex-ipo-trillionaire-wealth/ (June 12, 2026).

with even minimal technical experience and no specialized equipment can also directly download models from distribution platforms" to create AI CSAM directly on their computer.[63]

102.    The developers of modern open-weight image and video generation models "pretrain" their models on millions or billions of images or videos. This pretraining process is cost-intensive and is principally responsible for the model's core capabilities. In contrast, downstream users typically "fine-tune" open-weight models image and video generation models on hundreds or thousands of images or videos. This fine-tuning process is relatively cheap and serves only to "refine" and "steer" the model's previously-learned capabilities.

103.    Many users of open-weight AI image and video models, including for creating nude content, do not use fine-tuned versions and simply focus on "prompt-engineering" the model as it was released "off the shelf."

104.    Despite public access to and ability to change open-weight models, developers of open-weight models maintain control of the underlying model. Such control extends to safety parameters and features that developers can implement. Although downstream developers may fine-tune or otherwise limitedly adapt an open-weight model, those modifications build upon, rather than replace, the underlying foundation model. The ability of an open-weight model to generate CSAM either "off the shelf" or after user fine-tuning is greatly influenced by the model's familiarity with nude content from its initial training data.[64] Absent the release of that underlying CSAM-enabled model, the derivative applications at issue would not exist in their current form and would not possess the image- and video-generation capabilities that enabled the creation of CSAM.

105.    Moreover, as discussed above, developers of open-weight models maintain control of the underlying model such that safety parameters and features for the prevention of CSAM remain in the open-weight model developers' control.

**b.    The development of Stability AI models.**

106.    Stability AI released Stable Diffusion 1.0 in August 2022 as an open-weight text-to-image model, accompanied by a license, user agreement, beta testing, and an NSFW classifier intended to block

---

[63] Kamachee, Max, et al., *Video Deepfake Abuse: How Company Choices Predictably Shape Misuse Patterns*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5829303 (Jan. 30, 2026).
[64] *Id.*

the generation of sexually explicit content.[65] At the time of its release, Stable Diffusion 1.0 (SD 1.0) represented a breakthrough in open-weight image generation and quickly became the foundation for numerous derivative models and downstream applications.

107.    In December 2023, the Stanford Internet Observatory released a paper, "Identifying and Eliminating CSAM in Generative ML Training Data and Models," which found more than 3,200 CSAM images in the LAION-5B dataset. As Stable Diffusion models SD 1.0 and 1.5 were trained on CSAM, they had the ability to generate CSAM.[66]

108.    When an open-weight model has been trained on CSAM as Stable Diffusion was, these barriers prove easy to evade. "Usage terms are effectively unenforceable for an open-weight model . . . [and] the NSFW content classifier could be trivially disabled by users who downloaded the system" by modifying a single line of code.[67] To mitigate such creation, the developers should never have trained the models on NSFW content.



109.    On information and belief, this fatal flaw in the training data set and the fact that this would allow downstream developers and users to generate CSAM was known to the Stability AI Defendants and

---

[65] Blocking NSFW adult content will necessarily block the ability to create CSAM as well.

[66] Salvaggio, Eryk, *LAION-5B, Stable Diffusion 1.5, and the Original Sin of Generative AI*, TECH POLICY PRESS, https://www.techpolicy.press/laion5b-stable-diffusion-and-the-original-sin-of-generative-ai/ (Jan. 1, 2024).

[67] *Id.*

intentionally ignored because the LAION-5B dataset provided a cheap and quick method of training a new AI model on the large volume of data required.

110.    Stability AI could also see how the controls it implemented (or chose not to implement) in creating newer versions of Stable Diffusion directly caused the amount of NSFW content the versions could produce. This was clear in the amount of NSFW content produced using SD 1.0, SD 2.0, and SDXL. The change from SD 1.0 to SD 2.0 demonstrates a decrease in NSFW content produced because Stability AI introduced much stronger guardrails intended to prevent illegal content, including CSAM, for SD 2.0 including using an NSFW filter on training data.[68] But then going from SD 2.0 to SDXL there is an exponential increase in NSFW content because Stability had learned (including from disgruntled user posts on Reddit) that its "prude" 2.0 version was unpopular,[69] and so it rolled back the guardrails when designing SDXL.[70]

111.    On information and belief, Stability AI made the knowing and intentional business decision to remove the safety guardrails present in SD 2.0 when designing and releasing SDXL to generate increased usership of its AI models after discovering the lack of popularity of SD 2.0, with many users complaining on forums like Reddit that the model could not be used to create sexualized content.

112.    On information and belief, Stability AI knew that its models, once capable of generating sexually explicit images, would foreseeably be used to generate CSAM unless appropriate model-level safeguards were implemented. Stability AI also knew that no available safeguard could reliably eliminate that risk while continuing to permit unrestricted generation of sexually explicit images. Stability AI intentionally chose to profit off releasing the more permissive model SDXL anyway.

**c.    Stability AI's models are used by nudify apps to generate CSAM.**

113.    "Nudify"[71] app developers can limitedly modify Stability AI's open-weight models for the specific purpose of removing clothes from uploaded photos. That said, although downstream developers

---

[68] *Stable Diffusion 2.0 Release*, https://stability.ai/news-updates/stable-diffusion-v2-release (last visited Jul. 1, 2026).

[69] Vincent, James, *Stable Diffusion Made Copying Artists and Generating Porn Harder and Users are Mad*, VERGE, https://www.theverge.com/2022/11/24/23476622/ai-image-generator-stable-diffusion-version-2-nsfw-artists-data-changes (Nov. 24, 2022).

[70] Kamachee, Max, et al., *Video Deepfake Abuse: How Company Choices Predictably Shap Misuse Patterns*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5829303 (Jan. 30, 2026).

[71] "Nudify" apps are AI-applications specifically for creating fake nude images of people without their

may fine-tune or otherwise limitedly adapt Stability's open-weight models, those modifications build upon, rather than replace, the underlying foundation model. Absent Stability's models, the derivative applications would not exist in their current form and would not possess the image- and video-generation capabilities that enable the creation of CSAM.

114.    A user can use online guides to fine-tune a Stable Diffusion model easily. For example, one online guide allows users to do this in four steps. First, a user will provide an instance prompt to the model, which represents the concept to teach the model. Then, the user will provide a class prompt, which is "the category of the concept," such as woman, person, or child. Then, the user will upload the folder with training images. Finally, the user will create a folder for the model's outputs.[72]

115.    Regardless of whether a Stable Diffusion model has been fine-tuned on NSFW content, a user can also use online guides plus trial-and-error to prompt a Stable Diffusion model in a way that will make it generate non-consensual sexual content, especially of celebrities.[73]

116.    Regardless of whether a Stable Diffusion model has been fine-tuned on NSFW content, a user can also use "inpainting" and "outpainting" methods to have a model fill a specific region or extend the border of an image or video with synthetic pixels. For example, these techniques can be used to seamlessly attach a person's face to an AI-generated nude body.[74]

117.    Once a user has trained, prompted, or otherwise configured a Stable Diffusion model to their liking (within the limited range that it can be fine-tuned), they can integrate the model and run it, as many have done in creating nudify apps from base Stable Diffusion models.

118.    Researchers have found that "the Stable Diffusion family is the primary driver of image-based nudification," accounting for 42.7% of such images. Further, "these models lack effective guardrails against NSFW content generation, including sexual imagery."[75]

---

consent.

[72] Romero, Rubén, *Train Your Own Stable Diffusion Model Locally—No Code Needed,* MEDIUM, https://medium.com/better-programming/train-your-own-stable-diffusion-model-locally-no-code-needed-36f943825d23 (May 5, 2023).

[73] Mia, Jiachen, et al., *Jailbreaking Prompt Attack: A Controllable Adversarial Attack Against Diffusion Models,* https://aclanthology.org/2025.findings-naacl.172/ (last visited Jul. 1, 2026).

[74] Liu, Ziyi, et al., *FakeParts: A New Family of AI-Generated DeepFakes,* https://arxiv.org/abs/2508.21052 (Dec. 19, 2025).

[75] Cui, Chi, et al., *From Celebrities to Anyone: Characterizing AI Nudification Content, Technology, and Community Dynamics on 4chan,* (June 25, 2026).

119.     Stability AI models are thus particularly adept as base models for users to employ as "base architectures" for AI nudify apps.[76]

120.     Put another way, Stability AI didn't merely release neutral software that someone else misused. It released foundational generative models knowing that (1) they would be incorporated into downstream applications, (2) those applications would inherit the model's image- and video-generation capabilities, and (3) some of those applications would inevitably be used to generate CSAM absent adequate model-level safeguards that, on information and belief, Stability had implemented in its SD 2.0 models but chose thereafter to stop using.

121.     On information and belief, Stability AI made the business decision to remove the safety guardrails present in SD 2.0 when designing and releasing SDXL because of the lack of popularity of SD 2.0, with many users complaining on forums like Reddit that the model could not be used to create "NSFW" content. On information and belief, Stability AI knew that its models would be capable of producing CSAM once it was enabled to produce NSFW content. The only fully reliable way to ensure that CSAM is *not* generated through an AI image- and video-producing platform is to prohibit *all* sexually explicit images and videos. On information and belief, Stability AI prevented the production of NSFW content and then permitted it again after seeing the drop in popularity.

## VIII.   AI LARGE LANGUAGE MODEL LICENSING

122.     Part of the profit model of proprietary[36][77] AI Large Language Models (LLMs) is to license their use to third parties for marketing and sale for specialized purposes and targeted ~~costumer~~ customer bases. This business model, however, still requires use of the AI company's servers, where specialized, high-performance, and often proprietary server infrastructure, typically leveraging massive Graphics Processing Unit ("GPU") clusters (e.g., Nvidia H100s) hosted in secure cloud data centers, runs the AI model. Maintaining the AI model on proprietary company servers is critical because otherwise the model is at risk of being copied and disseminated, which would undermine its future profitability. In other words, proprietary-model AI companies are highly incentivized to route all AI generation through their own servers even when licensing or selling their product to third parties.

---

[76] *Id.*

[36][77] This is in contrast to open-source LLMs, which allow third-party developers to download, run, inspect, and modify the model, for free.

123. On information and belief, xAI licenses and sells their AI image- and video-producing models to third-party middleman applications.

124. On January 28, 2026, xAI announced Grok Imagine API ("application programing interface"), "a unified bundle of powerful APIs designed for end-to-end creative workflows."[37][78]

125. Per xAI's announcement, customers include HeyGen, Fal, ComfyUI, Invideo, and Flora,[38][79] all image- and video-generating platforms that are built off Grok and offer paid versions of their platforms. Though the customers using these models are interacting with the unique platform, the underlying model remains Grok. On information and belief, each of these platforms uses xAI servers to generate the AI images or videos it sells to customers.

## IX. AI-GENERATED CHILD SEXUAL ABUSE MATERIAL IS ILLEGAL

V. AI-Generated Child Sexual Abuse Material is Illegal

126. Title 18 U.S.C. § 2256(8) defines child pornography, or CSAM (aka CSAM),[80] as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." 18 U.S.C. § 2256(8).

127. "An identifiable minor" includes a person who was "a minor at the time the visual depiction was created, adapted, or modified; or whose image as a minor was used in creating, adapting, or modifying the visual depiction; and who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature[.]" 18 U.S.C. § 2256(9).

---

[37][78] *Grok Imagine API*, XAI, https://x.ai/news/grok-imagine-api (Jan. 28, 2026).

[38][79] *Id.*

[80] To reiterate, while Plaintiffs use the more accurate terminology of CSAM rather than "child pornography," Plaintiffs employ CSAM with the same meaning as 18 U.S.C. § 2256(8) sets forth for "child pornography." Plaintiffs use the term CSAM to recognize the severity of the crime depicted in the material and avoid re-victimizing the survivors.

128.    Title 18 U.S.C. §§ 2252A(a)(2) proscribes the knowing distribution of "child pornography," and § 2252A(a)(5)(B) proscribes the knowing possession of "child pornography."

129.    Production with the intent to distribute "child pornography" under 18 U.S.C. § 2252A(a)(7) proscribes "knowingly produc[ing] with intent to distribute, or distribut[ing], by any means, including a computer, in or affecting interstate or foreign commerce, child pornography that is an adapted or modified depiction of an identifiable minor." 18 U.S.C. § 2252A(a)(7).

130.    Real child pornography is not protected speech under the First Amendment. *Osborne v. Ohio*, 495 U.S. 103 (1990); *New York v. Ferber*, 458 U.S. 747 (1982). Nor is morphed child pornography—"any visual depiction . . . whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where . . . such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct"—protected speech. *United States v. Hotaling*, 634 F.3d 725 (2d Cir. 2011); *United States v. Mecham*, 950 F.3d 257 (5th Cir. 2020); *Doe v. Boland*, 698 F.3d 877 (6th Cir. 2012). *See also Shoemaker v. Taylor*, 730 F.3d 778, 786–87 (9th Cir. 2013).

131.    The AI-generated CSAM of Plaintiffs constitutes the production of child pornography under § 2252A(a)(7) because it involves the morphing, adaption, or modification of the images and videos of real children, retaining their identifiable features to produce sexually explicit content. This production was with the intent of distributing the resulting CSAM to the requesting customer through a licensee application.

7.    On information and belief, xAI possessed the CSAM of Plaintiffs on its servers after Grok produced their CSAM and then transported and distributed the unlawful contraband to its customer/user, namely, the perpetrator, using the cut-out or third-party middleman application.

8.    xAI advertised the features of Grok that would produce CSAM, namely, the "spicy" or "NSFW" sexual content, knowing that Grok could be used—and was being used—to produce CSAM.

VI.    Plaintiffs Suffered Severe Harm from xAI's Production of their AI-Generated CSAM

## X.    PLAINTIFFS SUFFERED SEVERE HARM FROM DEFENDANTS' PRODUCTION OF THEIR AI-GENERATED CSAM

### a.    Plaintiff Jane Doe 1

132.    On or about December 6, 2025, Jane Doe 1 received a message from an anonymous Instagram account. When she opened the message, she saw the user had sent her information about "pics" of

her which, according to the user, had been generated by a person known to Jane Doe 1 and disseminated over an online platform called Discord. Through a series of messages, the anonymous user went on to explain that the perpetrator had uploaded a folder of image and video files depicting her and other minor females to Discord. The anonymous user decided to alert Jane Doe 1 to the contents of the perpetrator's Discord account after seeing the explicit nature of the files.

133.    Eventually, the anonymous user sent Jane Doe 1 a series of AI-generated images and videos which depicted her as well as other minor females. Jane Doe 1 was immediately disturbed by the sexually explicit content. At least five of these files, one video and four images, depicted her actual face and body in settings with which she was familiar, but morphed into sexually explicit poses. The images showed her entire body, including her genitals, without any clothes. The video depicted her undressing until she was entirely nude.

134.    Jane Doe 1 was taken aback at the verisimilitude of the depictions: other than the fact that she knew she had never been in those situations or done those things, she could not visually distinguish these images and video as fake; they resembled real-life content in every way. The images were also produced using photographs of her which she recognized, three of which she knew had been taken when she was still a minor. One of the CSAM images was created using a photograph of her at her school's Homecoming, which was taken on or about September 20, 2025. Another (in addition to the four CSAM images) depicted her topless and appeared to be created using her yearbook photograph, taken on or about June 23, 2025. Jane Doe 1 also recognized the video as using her image from a photograph that Jane Doe 1 had taken with her family on August 3, 2024.

135.    The perpetrator had access to Jane Doe 1's images because he had maintained a close and friendly relationship with Jane Doe 1, taking advantage of Jane Doe 1's trust to entice her to send him photographs of herself.

136.    The three images and one video of Jane Doe 1 depicting her completely nude constitute CSAM, pursuant to 18 U.S.C. § 2256(8), because Grok and/or Stability AI morphed the files to depict the simulated lascivious exhibition of Jane Doe 1's genitals. Jane Doe 1's body was manipulated to produce sexually suggestive content, and posed in an unnatural, i.e. sexual, way given the setting of the original

images. The sole purpose behind such morphing was to create sexual content and to elicit a sexual response in the viewer.

137.    Based on the dates that the original images were taken, the production of AI-generated CSAM occurred ~~between in or about July 28, 2025, the date of Imagine's release and~~ on or before December 6, 2025, the date Jane Doe 1 viewed the AI-generated CSAM.

138.    The anonymous Instagram user also sent Jane Doe 1 the AI morphed images of at least two other minor females, whom she recognized, which also appeared to depict sexually explicit content.

139.    The anonymous user then provided Jane Doe 1 with a link to a Discord server, created by the perpetrator, which contained images and videos of at least 18 other minor females (including Jane Doe 2 and Jane Doe 3), many of whom Jane Doe 1 recognized from her school. The images appeared to have been created from photographs posted on various social media platforms.

140.    Jane Doe 1 began the process of alerting the other minor victims and their families, and ultimately, local law enforcement was contacted, and a criminal investigation was opened. In late December 2025, local police arrested the perpetrator and conducted a search of his phone.

141.    Jane Doe 1 has since learned through the criminal investigation that the perpetrator created other AI-generated material depicting her, including an AI-generated image taken from a photograph of Jane Doe 1 hiking on April 19, 2025.

142.    The application on the perpetrator's phone used to create the AI CSAM of Plaintiffs relied on Stability AI's image-producing tools to generate the unlawful content.

143.    ~~11.~~Jane Doe 1 also learned that the perpetrator uploaded and traded her AI-generated CSAM files on Telegram, a messaging application, and Mega, a file sharing platform. According to the criminal investigator, the perpetrator used her AI-generated CSAM as a bartering tool in Telegram group chats with hundreds of other users, trading her CSAM files for sexually explicit content of other minors.

144.    ~~12.~~Jane Doe 1 has suffered severe emotional distress as a result of the production and distribution of her AI-generated CSAM. She feels acute anxiety about who has viewed these files online and feels a complete lack of control over the ongoing dissemination of the files. Her ability to participate in her normal daily activities has been impaired by the resulting anxiety, depression, and stress. She has difficulty eating and sleeping and suffers from recurring nightmares. She lives in fear that the perpetrator may be

continuing to generate additional CSAM content using the same xAI AI tools to morph her images, and that other child predators may be continuing to trade the AI-generated CSAM depicting her online. Attending school has become difficult and anxiety-producing. Jane Doe 1 has had to request academic support and special accommodations, due to the ongoing mental health issues resulting from the harm of her AI-produced CSAM. Jane Doe 1 has further suffered substantial reputational harm, as the AI-generated CSAM was spread among hundreds of users, and it was not clear that the images and video were digitally altered.

### b.  Plaintiff Jane Doe 2

145.    On or about February 12, 2026, Jane Doe 2 learned through the same ongoing criminal investigation into the same perpetrator who created CSAM from Jane Doe 1's images, that at least two of her images had also been used by the perpetrator to produce AI-generated CSAM using xAI. Local law enforcement informed Jane Doe 2, a minor, and her mother that these images included one photograph taken of Jane Doe 2 on the beach in a blue bikini which had been morphed to depict her without any clothes. Jane Doe 2 reviewed her Instagram photographs and found a series of images taken on October 12, 2025, depicting her in a blue bikini top in a beach setting.

146.    On information and belief, the AI-generated CSAM image of Jane Doe 2 was produced between on or about October 12, 2025, and late December 2025, when the perpetrator was apprehended by law enforcement.

147.    Jane Doe 2's mother also learned from law enforcement that the AI tool used to generate the CSAM was xAI. According to law enforcement, the perpetrator also used an application on his phone to produce CSAM.

148.    The application on the perpetrator's phone used to create the AI CSAM of Plaintiffs relied on Stability AI's image-producing tools to generate the unlawful content.

149.    3. The images depicting Jane Doe 2 nude constitute CSAM, pursuant to 18 U.S.C. § 2256(8), because Grok and/or Stability AI morphed the files to depict the simulated lascivious exhibition of Jane Doe 2's genitals. Jane Doe 2's body was manipulated to produce sexually suggestive content, and posed in an unnatural, i.e. sexual, way given the setting of the original images (a public beach). The sole purpose behind such morphing was to create sexual content and to elicit a sexual response in the viewer.

4. Jane Doe 2's mother also learned from law enforcement that the AI tool used to generate the CSAM was xAI, a generative AI also known as Grok. According to law enforcement, the perpetrator used an application on his phone through which the xAI technology was accessed and used to produce CSAM.

5. The application the perpetrator used to create the AI CSAM of Plaintiffs relied on Grok's image- and video-producing tools to generate the unlawful content.

6. On information and belief, this application was a licensee of xAI, or had otherwise purchased its access to Grok, and was used as a cut-out or middleman so that xAI could intentionally and knowingly profit from the sale of access to the Grok model for illicit and unlawful purposes, such as the production of CSAM, all while attempting to shield itself from liability.

7. On information and belief, any AI-generated image or video using Grok, even when initiated through a middleman application or platform, requires the use of xAI servers, on which Grok is run, to produce the file. xAI has not made Grok' AI model publicly available and has not licensed Grok in its entirety but instead licenses the use of its servers to these middlemen companies, knowing that any illicit and unlawful content generated through prompts to these applications will ultimately be created and distributed from xAI servers.

150. 8. Jane Doe 2 has suffered severe emotional distress as a result of the production and distribution of her AI-generated CSAM, including acute anxiety. She fears that her classmates and an unknown number of strangers may have already viewed her AI-generated CSAM online. As a result of her anxiety, Jane Doe 2 is unable to sleep to the point of seeking medical intervention. Jane Doe 2 is terrified of retribution for participating in the criminal investigation and is fearful of engaging in her normal daily activities as a result. She has begun self-isolating and avoiding being on her school campus, and even dreads attending her own graduation. What should have been a celebratory final semester of school has turned into a nightmare.

151. 9. Jane Doe 2 is also terrified that her AI-generated CSAM will impact her college application process, with college admissions officers finding these images of her online and assuming they are real. She has anxiety about how these images may follow her through her college life, including limiting her from participating in campus clubs or social groups who prohibit members from producing sexually explicit content. She feels a complete lack of control over the ongoing dissemination of the AI-generated CSAM

images and what this will mean for her life. Jane Doe 2 has also suffered reputational harm, as it is not apparent that the images are digitally altered. Jane Doe 2 further fears for her safety, as the AI-generated CSAM creates a substantial risk that people will discover her real identity and she will become a victim of stalking.

### c.   **Plaintiff Jane Doe 3**

152.   On or about February 12, 2026, Jane Doe 3 learned through the same ongoing criminal investigation into the same perpetrator who created CSAM using Jane Doe 1 and Jane Doe 2's images, that at least one of her images had also been used by the perpetrator to produce AI-generated CSAM.

153.   Local law enforcement informed Jane Doe 3, a minor, and her mother that the AI-generated images found on the perpetrator's phone included one image of Jane Doe 3 which had been morphed to depict her fully nude.

154.   On information and belief, the AI-generated CSAM image of Jane Doe 3 was produced between in or about July 28, 2025, when Grok Imagine was released with the ability to produce sexually explicit content, and on or before late December 2025, when the perpetrator was apprehended by law enforcement.

155.   The image depicting Jane Doe 3 completely nude constitutes CSAM, pursuant to 18 U.S.C. § 2256(8), because the AI tools/Grok morphed the file to depict the simulated lascivious exhibition of Jane Doe 3's genitals. Jane Doe 3's body was manipulated to produce sexually suggestive content, and posed in an unnatural, i.e. sexual, way given the setting of the original image. The sole purpose behind such morphing was to create sexual content and to elicit a sexual response in the viewer.

156.   The application on the perpetrator's phone used to create the AI CSAM of Plaintiffs relied on Stability AI's image-producing tools to generate the unlawful content

157.   5. Jane Doe 3 has experienced severe emotional distress as a result of the production and dissemination of her AI-generated CSAM. She suffers from constant stress, anxiety, and fear that someone will see the CSAM and recognize her face. Jane Doe 3 has no idea how many people will be able to access and view her CSAM online and feels a profound loss of control. Jane Doe 3 has suffered reputational harm from the production and dissemination of the AI-generated CSAM, as it is not readily apparent that the

images were digitally altered. Jane Doe 3 further fears for her safety, as the AI-generated CSAM creates a substantial risk that people will discover her real identity and she will become a victim of stalking.

~~VII.    Ongoing Harm From the Dissemination of Plaintiffs' CSAM Files~~

### d.    Plaintiff Jane Doe 4

158.    On or before February 12, 2026, Jane Doe 4's stepfather uploaded an image of Jane Doe 4 into the Grok application on his phone. The image depicted Jane Doe 4 when she was approximately 11 years old and showed her lying on a couch wearing an oversized t-shirt with a panda on it.

159.    Using this image, Jane Doe 4's stepfather prompted Grok to generate approximately 7,000 sexually explicit images depicting Jane Doe 4. The AI-modified images depicted Jane Doe 4's 11-year-old identifying features in multiple sexually explicit poses.

160.    For instance, in one image, Jane Doe 4 is depicted nude in a kneeling position, with an adult male positioned behind her, while she uses her hand to masturbate her exposed genitals. The adult male's hands are positioned on her breasts.

161.    In another image, Jane Doe 4 is depicted standing completely nude with her genitals visible.

162.    Another image depicts Jane Doe 4 fully nude, orally copulating an erect penis.

163.    In another image, an erect male penis is visible behind Jane Doe 4, and what appears to be ejaculate is covering her exposed breasts.

164.    In another image, Jane Doe 4 is depicted orally copulating her stepfather, whose erect penis has been morphed by AI to appear unnaturally large. The words, "She sucks it," are written across the image.

165.    Another image depicts an unnaturally large erect penis behind Jane Doe 4, who is fully nude. The words, "Stepdad rapes her," appear underneath her image.

166.    In the thousands of the sexually explicit images Grok generated, Jane Doe 4's 11-year-old facial features are visible and identifiable.

167.    The images depicting Jane Doe 4 masturbating and orally copulating a penis, among other sexually explicit content, constitute CSAM, pursuant to 18 U.S.C. § 2256(8).

168.    The images of Jane Doe 4 depicting her completely nude also constitutes CSAM, pursuant to 18 U.S.C. § 2256(8), because Grok morphed the file to depict the simulated lascivious exhibition of Jane

Doe 4's genitals. Jane Doe 4's 11-year-old body was manipulated to produce sexually suggestive content, and posed in an unnatural, i.e. sexual, way given the setting of the original image. The sole purpose behind such morphing was to create sexual content and to elicit a sexual response in the viewer.

169.    On information and belief, the reason Jane Doe 4's stepfather used Grok to generate the sexually explicit images of Jane Doe 4 is because the platform was less restrictive than other AI models and responded to his prompts to generate sexually explicit material using an image depicting a prepubescent minor.

170.    On information and belief, Jane Doe 4's stepfather trafficked Jane Doe 4's AI-generated CSAM online via social media platforms, exchanging CSAM of Jane Doe 4 for CSAM produced by other child sex predators.

171.    On or around February 12, 2026, Jane Doe 4's stepfather was traveling for work when he prompted Grok to generate CSAM depicting the 11-year-old Jane Doe 4 being gang-raped by a group of men. At this point, xAI finally generated a CyberTip to NCMEC. xAI, however, included only the original, non-CSAM image of Jane Doe 4 lying on a couch in the report—not the thousands of images of AI-generated CSAM that Grok had already produced for the perpetrator using the same original image.

172.    Over the next two weeks, law enforcement officers working with the Wyoming ICAC mobilized to search for the victim and identify the perpetrator. xAI obstructed this investigation at every turn. Despite the fact that 18 U.S.C. § 2258A requires electronic service providers like xAI to report CSAM violations to NCMEC, and lists IP address information as relevant information to include to assist in identifying the perpetrator, xAI failed to provide this critical piece of information, which would have been in xAI's possession. *See* 18 U.S.C. §§ 2258A(a), (b)(1).

173.    The supervisory investigator in Jane Doe 4's case reached out multiple times to xAI to request location information (IP address) for the upload of Jane Doe 4's image to Grok. This information not only would have assisted in identifying the perpetrator but also would have provided the basis for jurisdiction for a potential criminal charge. xAI failed to respond to the investigator's requests, and to NCMEC's requests, stymying law enforcement efforts to locate, identify, and apprehend the perpetrator.

174.    xAI's failure to provide location information in its original CyberTip and its subsequent refusal to respond to the lead investigators' multiple requests for such information amounted to intentional

obstructive conduct and had the effect of impeding the investigation into Jane Doe 4's stepfather's conduct. xAI's business decision to avoid mandatory reporting requirements under § 2258A had the result of impeding the investigation into Jane Doe 4's perpetrator, slowing down law enforcement efforts to locate, arrest, and charge the perpetrator.

175.    Notwithstanding xAI's obstruction of the criminal investigation, the Wyoming ICAC was eventually able to locate Jane Doe 4's stepfather. On or about February 27, 2026, law enforcement obtained a warrant to search his residence where investigators seized multiple digital devices belonging to Jane Doe 4's stepfather. A forensic review revealed approximately 7,000 AI-generated images and videos depicting Jane Doe 4, which her stepfather had produced using Grok.

176.    The lead investigator met with Jane Doe 4 during the search on February 27 and showed her a redacted image of the Grok-generated CSAM, which she was able to identify as a photograph of her from when she was approximately 11 years old.

177.    Jane Doe 4's stepfather was arrested following the search, charged with child exploitation offenses, and released on bail later that night. Two days later, on March 1, 2026, he shot himself.

178.    Without the ease and access that AI—and specifically, Grok—offered, Jane Doe 4's stepfather would never have been able to generate CSAM depicting her.

179.    Following her stepfather's suicide, Jane Doe 4 entered a period of extreme personal crisis. She had to grapple with the trauma of her own sexual exploitation while at the same time assisting her mother in navigating the loss of her stepfather. Overnight, Jane Doe 4's entire reality was shattered by the dual tragedies of child sexual exploitation and suicide. Her family was torn apart, and her life became a nightmare.

180.    Jane Doe 4 has suffered severe emotional distress as a result of the production of her AI-generated CSAM. She struggles with feelings of self-loathing and disgust when she thinks about others viewing CSAM images of her and she feels as though her childhood has been stolen from her. She experiences extreme anxiety in her daily life and is overcome with fear that her CSAM images will be found by others online. She also suffers from depression and sleeps excessively. When she is awake, she struggles with suicidal thoughts.

181.    Jane Doe 4 has further suffered substantial reputational harm, as the AI-generated CSAM was spread among an unknown number of users online and there is no way now to permanently remove this content from the internet.

**e.    Plaintiff Jane Doe 5**

182.    Jane Doe 5 graduated from eighth grade approximately four years ago in a ceremony that was open to the students at her middle school and their families. Along with several of her friends, Jane Doe 5 posed for a photograph, wearing a formal, yellow flowered dress. In the photograph, she is pictured standing in the middle of her group of friends, her arms around the two friends on either side of her; she is beaming.

183.    On a date before March 27, 2026, an adult male relative of one of her classmates used the same graduation photograph to generate CSAM depicting Jane Doe 5. Specifically, with a Grok application on his phone, the perpetrator removed all of Jane Doe 5's clothes, modifying the image so that Jane Doe 5's identifying 14-year-old features were attached to a fully nude body.

184.    This image of Jane Doe 5 depicting her completely nude constitutes CSAM, pursuant to 18 U.S.C. § 2256(8), because Grok morphed the file to depict the simulated lascivious exhibition of Jane Doe 5's genitals. Jane Doe 5's 14-year-old body was manipulated to produce sexually suggestive content, and posed in an unnatural, i.e. sexual, way given the setting of the original image in a sexual. The sole purpose behind such morphing was to create sexual content and to elicit a sexual response in the viewer.

185.    On or about March 2026, law enforcement discovered Jane Doe 5's AI-generated CSAM image during an investigation into the perpetrator for online child exploitation offenses. The perpetrator used CSAM images to trade for other CSAM through applications in which he could mask his identity and attempt to evade law enforcement. Specifically, the perpetrator exhibited a preference for CSAM depicting children ages two to ten years old and used CSAM images to trade with other child sex predators with similar predilections to obtain this type of content.

186.    Law enforcement was able to identify Jane Doe 5 and notified her that her AI-generated CSAM image had been distributed to other child sex predators online. The hash value for Jane Doe 5's image was also submitted to NCMEC so that anytime this CSAM is identified in any other criminal investigation, Jane Doe 5 will be notified. However, it is impossible to know how many other child sex

predators may now possess Jane Doe 5's CSAM, nor how widely her CSAM has now been disseminated online through darknet channels and applications.

187. On March 27, 2026, the perpetrator was charged with CSAM offenses based on his extensive possession and distribution of CSAM content. Jane Doe 5 is not one of the named victims in that pending criminal case which is limited to non-AI generated CSAM.

188. Jane Doe 5 has suffered severe emotional distress as a result of the production and distribution of her AI-generated CSAM. She feels acute anxiety about who has viewed these files online and feels a complete lack of control over the ongoing dissemination of the files. Her anxiety is further heightened given how easily an innocuous image of her was used to generate CSAM. This has impacted her ability to participate in her normal daily activities and has resulted in a constant level of fear of being in public spaces. She also lives in fear that other perpetrators online may be continuing to trade her CSAM in forums visited by extremely dangerous child sex predators, and reasonably fears being identified and pursued by such predators both online and in person.

189. Her mental state has also affected her education: she has been distracted from her studies, has had trouble focusing, and has experienced anxiety at school, all as a result of the ongoing harm of her AI-produced CSAM.

190. Jane Doe 5 has further suffered substantial reputational harm, as the AI-generated CSAM was spread among an unknown number of users online and there is no way now to permanently remove this content from the internet.

## XI. ONGOING HARM FROM THE DISSEMINATION OF PLAINTIFFS' CSAM FILES

191. All three All five Plaintiffs learned from law enforcement that the digital identification identifications of their AI-generated CSAM files has have been entered into a national database managed by NCMEC. Because Plaintiffs are now identified victims of known CSAM files, NCMEC will send them notifications every time their CSAM files are identified as part of any criminal case or investigation. This means that for the rest of Plaintiffs' lives they will likely receive periodic NCMEC notifications alerting them that criminal defendants have possessed, received, or distributed CSAM files depicting them, subjecting them to constant waves of extreme stress and anxiety.

192.    Perhaps even more distressing to Plaintiffs, however, is the trafficking of their CSAM images that will remain undetected by law enforcement. This trafficking began when the perpetrator traded their AI-generated CSAM on sites like Discord, Telegram, and Mega, among other online social media and chat platforms. The trading of their CSAM files will now almost certainly continue as other pedophiles, in turn, use their CSAM files as barter in the dark world of online CSAM trafficking. Plaintiffs will live every day with the constant anxiety of not knowing whether someone they encounter has seen this invasive and sexually explicit content created of images of them as children.

193.    This For Does 1-3, this anxiety is particularly acute at school, since the Plaintiffs do not know whether the anonymous user may be a fellow classmate and whether their CSAM files may have been distributed among others at their school. According to the Discord server Jane Doe 1 reviewed, it also appears the victims' true first names and the name of their school was attached to their files online, meaning other online predators may also be able to identify them, creating a substantial risk for stalking.

## XII.    CLASS ALLEGATIONS

194.    This action is brought by Plaintiffs individually and on behalf of the ClassClasses, as defined below, pursuant to Rule Rules 23(a), (b)(3) and 23(b)(2), (c)(4), and (g) of the Federal Rules of Civil Procedure;:

xAI Class: All persons in the United States who had real images of themselves as minors altered by xAI/Grok to produce sexualized images or videos of sexually explicit conduct or content with their faces and/or other distinguishing features reasonably identifiable.

Tennessee xAI Subclass: All persons in the state of Tennessee who had real images of themselves as minors altered by Grok to produce sexualized images or videos, constituting intimate digital depictions with their faces and/or other distinguishing features reasonably identifiable.

Stability AI Class: All persons in the United States who had real images of themselves as minors altered by an app built upon a Stability AI model to produce images or videos of sexually explicit conduct or content with their faces and/or other distinguishing features reasonably identifiable.

Tennessee Stability AI Subclass: All persons in the state of Tennessee who had real images of themselves as minors altered by an app built upon a Stability AI model to produce sexualized images or videos, constituting intimate digital depictions with their faces and/or other distinguishing features reasonably identifiable.

195.    The Class consists The Classes consist of at least thousands of minors and thus is are so numerous that joinder of all members is impracticable.

196.    The claims asserted by Plaintiffs are typical of the claims of the Class Members, who also had real images of themselves digitally altered into AI-generated CSAM.

197.    The Plaintiffs will fairly and adequately protect the interests of the Class Classes and do not have any interests antagonistic to those of other Class membersMembers.

198.    The Plaintiffs have retained attorneys who are knowledgeable and experienced in survivors' rights and class action matters, as well as complex litigation.

199.    This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the Class Classes predominate over those questions giving rise to common answers that move this litigation forward includingany questions affecting only individual Class Members. These common questions include, but are not limited to:

    a.    Whether xAI was aware of Grok's ability to create and distribute CSAM featuring reasonably indefinable features of real minors;

    a.    b.Whether xAI was aware of Grok's was being used Whether xAI and Stability AI were aware of their respective AI models' ability to create and distribute CSAM featuring reasonably indefinable identifiable features of real minors;

    b.    c.Whether xAI promoted Grok despite knowing it was and Stability AI were aware their respective AI models were being used to create and distribute CSAM featuring reasonably indefinable identifiable features of real minors;

c.    Whether xAI and Stability AI promoted their respective AI models despite knowing they were being used to create and distribute CSAM featuring reasonably identifiable features of real minors;

d.    Whether xAI and Stability AI knowingly produced CSAM featuring reasonably identifiable features of real minors;

e.    d. Whether xAI knowingly distributed Grok-generated CSAM featuring reasonably identifiable features of real minors over the internet;

f.    e. Whether xAI knowingly processed possessed Grok-generated CSAM featuring reasonably identifiable features of real on its servers; features of real minors on its servers;

g.    Whether xAI and Stability AI profited from their respective AI models' ability to create CSAM featuring reasonably identifiable features of real minors;

f.    Whether xAI profited from Grok's ability to create CSAM featuring reasonably indefinable features of real minors;

h.    g. Whether xAI knowingly profited from an Whether xAI and Stability AI benefitted financially from participating in illegal sex trafficking venture ventures targeting minors in violation of 18 U.S.C. § 1591;

i.    h. Whether xAI and Stability AI owed Plaintiffs and the proposed Class Classes a duty to exercise reasonable care in the design, development, training, deployment, and operation of Grok their respective AI model so as to prevent Grok the AI models from being used to create, generate, or distribute CSAM depicting real minors;

j.    i. Whether xAI and Stability AI breached their duty of undertaking by failing to use reasonable care to prevent the creation and distribution of CSAM depicting real minors; and

k.    j. Whether xAI and Stability AI could have put additional guardrails in place to prevent Grok's their respective AI model's ability to create CSAM featuring reasonably indefinable identifiable features of real minors. ;

l.    Whether Defendants' AI models were defectively designed because they permitted the creation of AI-generated CSAM depicting real minors;

- 43 -

m.    Whether a feasible safer alternative design existed that would have reduced or prevented the generation of such CSAM;

n.    Whether the risks of Defendants' design choices outweighed their utility;

o.    Whether Defendants violated 18 U.S.C. § 2255(a); 18 U.S.C. § 2251(a); 18 U.S.C. § 2258A; 18 U.S.C. §§ 2252A(a)(2), (5)(B), (a)(7), and (f)(1); and 18 U.S.C. §§ 1591, 1594, and 1595.

p.    Whether Defendants' conduct constituted an unlawful and/or unfair business practice

q.    Whether Defendants' disregarded a substantial probability of causing severe emotional distress to the individuals who are depicted in Defendants' AI-generated CSAM; and

r.    Whether Defendants' creation and dissemination of AI-generated CSAM, or of models used to create and disseminate AI-generated CSAM, unreasonably interfered with a right common to the general public.

200.    In addition, the class device is the superior mechanism for handling this action, and a class trial is eminently manageable.

201.    This action is also appropriate as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because xAI's decision and Stability AI's decisions to eschew industry standard guardrails to prevent the creation and distribution of CSAM affects all class members Class Members in the same way (within each Class), and any injunctive relief awarded will affect the each Class as a whole.

202.    Finally, at the very minimum, this action is appropriate using for issues classes pursuant to Rule 23(c)(4) because there are multiple common issues relating to xAI's and Stability AI's uniform conduct, such as (but not limited to) failing to prevent the creation and distribution of CSAM by Grok their respective AI models, knowingly producing, possessing and distributing CSAM, and xAI's monetizing Grok's their AI models' ability to create and distribute CSAM.

## XIII.    CAUSES OF ACTION

### COUNT I 1
**Masha's Law: Production with the Intent to Distribute of Child Pornography
18 U.S.C. §§ 2255(a), 2252A(a)(7 2251(a)
(on behalf of all Plaintiffs and the Class all Classes against all Defendants)**

203.    Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count I 1 are made against all Defendants.

- 44 -

204.    Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

205.    Plaintiffs on behalf of themselves and the ~~Class~~ Classes bring civil claims pursuant to Masha's Law based on Defendants' violation of 18 U.S.C. § ~~2252A(a)(7), which prohibits the knowing production with intent to distribute, or distribution, by any means, including a computer, in or affecting interstate or foreign commerce,~~ ~~child pornography that is an adapted or modified depiction of an identifiable minor~~2251(a), which prohibits the use of a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

~~4.Defendants' AI technology produced CSAM, as defined by 18 U.S.C. § 2256(8), using Plaintiffs' and the Class Members' real images, and then distributed the AI-generated CSAM images and videos from xAI servers over the internet, a means of interstate commerce, to customers, including customers paying for this premium feature, and to customers of third-party middlemen licensees. In all instances, the real images and videos uploaded into Defendants' servers were not unlawful CSAM but only became unlawful content after Defendants' AI morphed the files on xAI servers to produce and distribute CSAM.~~

206.    Defendants' AI technology was used to produce CSAM, using Plaintiffs' and the Class Members' real images to depict them as "minor[s] engag[ing] in" "sexually explicit conduct." 18 U.S.C. § 2251(a). With respect to the xAI Defendants, Grok produced this CSAM on xAI's own servers. With respect to the Stability AI Defendants, their open-weight models—released to the public and incorporated into third-party applications—produced this CSAM when run by users. In each instance, Defendants designed and released their AI technology with capabilities of producing such CSAM.

207.    Defendants knew or had reason to know that such visual depictions would be produced, transported or transmitted using any means or facility of interstate or foreign commerce, including produced using materials that had been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, and such visual depictions had actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including the internet.

- 45 -

208.    5.Plaintiffs and the Class Plaintiffs and the Classes suffered personal injury as a result of Defendants' violation of 18 U.S.C. § 2252A(a)(7).2251(a)

209.    6.Title 18 U.S.C. § 2255, entitled "Civil Remedy for Personal Injuries," provides that any person who is a victim of a violation of 18 U.S.C. § 2252A and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000 per victim, and reasonable attorney's fees.

210.    7.Plaintiffs and the Class Classes intend to prove actual damages as a result of Defendants' conduct.

211.    8.At minimum, Plaintiffs intend to seek statutory liquidated damages in the amount of $150,000 per violation against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

212.    9.Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**COUNT II2**
**Masha's Law: Distribution of Production with the Intent to Distribute Child Pornography**
**18 U.S.C. §§ 2255(a), 2252A(a)(22252A(a)(7)**
**(on behalf of all Plaintiffs and the Class all Classes against all Defendants)**

213.    10.Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count II2 are made against all Defendants.

214.    11.Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

215.    12.Plaintiffs on behalf of themselves and the Class Classes bring civil claims pursuant to Masha's Law based on Defendants' violation of 18 U.S.C. § 2252A(a)(2), which prohibits knowingly distributing any "child pornography" using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any

means, including by computer; or any material that contains child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.2252A(a)(7), which prohibits the knowing production with intent to distribute, or distribution, by any means, including a computer, in or affecting interstate or foreign commerce, child pornography that is an adapted or modified depiction of an identifiable minor.

216.    13.Defendants' AI technology produced CSAM, as defined by 18 U.S.C. § 2256(8), using Plaintiffs' and the Class Classes Members' real images, and to depict them as "minor[s] engaging in sexually explicit conduct," 18 U.S.C. § 2252A(a). Defendant xAI then distributed the AI-generated CSAM images and videos from Defendant xAI servers, or through third-party licensees, over the internet, a means of interstate commerce, to customers, including customers paying for this premium feature, and to customers of third-party middlemen licensees. In all instances, the real images and videos uploaded into Defendants' servers were not unlawful CSAM but only became so after Defendants' AI morphed the files on xAI servers to produce and distribute CSAM.With respect to the Stability AI Defendants, their open-weight models—released to the public and incorporated into third-party applications—produced this CSAM and Stability AI Defendants understood it would then be distributed to the applications' users. In each instance, Defendants created their AI technology with capabilities that made distributing such CSAM possible.

217.    In all instances, the real images and videos uploaded into Defendants' image-generation base models were not unlawful CSAM but only became unlawful content after Defendants' AI morphed the files to produce and distribute images or videos of Class Members as "minor[s] engaging in sexually explicit conduct." 18 U.S.C. § 2252A(a).

218.    14.Plaintiffs and the Class Classes suffered personal injury as a result of Defendants' violation of 18 U.S.C. § 2252A(a)(22252A(a)(7).

219.    18 U.S.C. § 2252A(f)(1) provides that "[a]ny person aggrieved by reason of the conduct prohibited under subsection (a) or (b)" may commence a civil action and seek relief including "(A) temporary, preliminary, or permanent injunctive relief; (B) compensatory and punitive damages; and (C) the costs of the civil action and reasonable fees for attorneys and expert witnesses." 18 U.S.C. § 2252A(f).

220.    Title 18 U.S.C. § 2255, entitled "Civil Remedy for Personal Injuries," provides that any person who is a victim of a violation of 18 U.S.C. § 2252A and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000 per victim, and reasonable attorney's fees.

221.    15.Plaintiffs and the Class Classes intend to prove actual damages as a result of Defendants' conduct.

222.    16.At minimum, Plaintiffs intend to seek statutory liquidated damages in the amount of $150,000 per violation against each DefendantDefendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

223.    17.Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**COUNT III3**
**Masha's Law: Possession Distribution of Child Pornography**
**18 U.S.C. §§ 2255(a), 2252A(a)(5)(B2252A(a)(2)**
**(on behalf of all Plaintiffs and the xAI Class and Tennessee xAI Subclass against all the xAI Defendants)**

224.    18.Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count III 3 are made against all xAI Defendants.

225.    19.Plaintiffs bring this Count individually and on behalf of the other xAI Class Members and Tennessee xAI Subclass they seek to represent.

226.    20.Plaintiffs on behalf of themselves and the Class and Subclass bring claims pursuant to Masha's Law based on the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(5)(B2252A(a)(2), which prohibits knowingly possessing any material that contains an image of distributing any "child pornography" that was produced using materials that have using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by

any means, including by computer; or any material that contains child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

21.Defendants' AI technology produced CSAM, as defined by 18 U.S.C. § 2256(8), using Plaintiffs' and the Class Members' real images, generating CSAM using image databases on its servers. The production of this CSAM was in or affecting interstate or foreign commerce by any means, including by computer. Defendants possessed the resulting AI-generated CSAM on their servers before distributing the AI-generated CSAM images and videos to customers.

227.    The xAI Defendants' AI technology produced CSAM, creating images or videos of Class and Subclass Members as "minor[s] engaging in sexually explicit conduct," 18 U.S.C. § 2252A(a), and then distributed the AI-generated CSAM images and videos from company servers, or through third-party licensees over the internet, a means of interstate commerce, to customers, including customers paying for this premium feature, and to customers of third-party middlemen licensees, websites, and applications. In all instances, the real images and videos uploaded into the xAI Defendants' servers, or to those of third-party licensees, were not unlawful CSAM but only became so after the xAI Defendants' AI morphed the files to produce and distribute CSAM.

228.    22.Plaintiffs and the Class and Subclass suffered personal injury as a result of the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(5)(B2252A(a)(2).

229.    23.Plaintiffs and the Class and Subclass intend to prove actual damages as a result of the xAI Defendants' conduct.

230.    18 U.S.C. § 2252A(f)(1) provides that "[a]ny person aggrieved by reason of the conduct prohibited under subsection (a) or (b)" may commence a civil action and seek relief including "(A) temporary, preliminary, or permanent injunctive relief; (B) compensatory and punitive damages; and (C) the costs of the civil action and reasonable fees for attorneys and expert witnesses." 18 U.S.C. § 2252A(f).

231.    24.At minimum, Plaintiffs and the Class intend to seek statutory liquidated damages in the amount of $150,000 per violation against each Defendantthe xAI Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and

post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

232.    25.The xAI Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish the xAI Defendants and deter others from like conduct.

**COUNT IVTrafficking Victims Protection Act, Beneficiary Liability18 U.S.C. §§ 1595, 1594, 1591(a)(2COUNT 4**
**Masha's Law: Possession of Child Pornography**
**18 U.S.C. §§ 2255(a), 2252A(a)(5)(B)**
**(on behalf of all Plaintiffs and the xAI Class and Tennessee xAI Subclass against all the xAI Defendants)**

233.    26.Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count IV 4 are made against all xAI Defendants.

234.    Plaintiffs bring this Count individually and on behalf of the xAI Class and Tennessee xAI Subclass they seek to represent.

235.    Plaintiffs on behalf of themselves and the Class and Subclass bring claims pursuant to Masha's Law based on the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(5)(B), which prohibits knowingly possessing any material that contains an image of "child pornography" that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

236.    The xAI Defendants' AI technology produced CSAM, "minor[s] engaging in sexually explicit conduct," 18 U.S.C. § 2252A(a), using Plaintiffs' and the Class Members' real images, generating CSAM using image databases on its servers, or on those of third-party licensees. The production of this CSAM was in or affecting interstate or foreign commerce by any means, including by computer. The xAI Defendants possessed the resulting AI-generated CSAM on their servers, before those AI-generated CSAM images and videos were distributed to customers.

237. On information and belief, xAI possessed the CSAM of Plaintiffs on its servers after Grok produced their CSAM and then transported and distributed the unlawful contraband to its customer/user, namely, the perpetrator.

238. Plaintiffs and the Class and Subclass suffered personal injury as a result of the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(5)(B).

239. Plaintiffs and the Class and Subclass intend to prove actual damages as a result of the xAI Defendants' conduct.

240. 18 U.S.C. § 2252A(f)(1) provides that "[a]ny person aggrieved by reason of the conduct prohibited under subsection (a) or (b)" may commence a civil action and seek relief including "(A) temporary, preliminary, or permanent injunctive relief; (B) compensatory and punitive damages; and (C) the costs of the civil action and reasonable fees for attorneys and expert witnesses." 18 U.S.C. § 2252A(f).

241. At minimum, Plaintiffs and the Class and Subclass intend to seek statutory liquidated damages in the amount of $150,000 per violation against the xAI Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

242. The xAI Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish the xAI Defendants and deter others from like conduct.

## COUNT 5
### Obscene Visual Representations of the Sexual Abuse of Children
### 18 U.S.C. § 2252A(f)(1)
### (on behalf of all Plaintiffs and all Plaintiffs and all Classes against all Defendants)

243. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 5 are made against all Defendants.

244. Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

245. Plaintiffs on behalf of themselves and the Classes bring claims based on Defendants' violations of 18 U.S.C. § 2252A(f)(1), which permits an individual to recover for a violation of 18 U.S.C. § 1466A, which prohibits (a) knowingly producing, distributing, receiving, or possessing with intent to distribute a visual depiction of any kind that depicts a minor engaged in sexually explicit conduct, is obscene, or depicts a minor engaged in a sexually explicit act and lacks serious literary, artistic, political, or scientific value; or (b) possessing a visual depiction as described in subsection (a).

246. All Defendants knowingly produced AI-generated visual depictions of minors—Plaintiffs and the Classes and Subclass—engaged in sexually explicit conduct, in an obscene manner, or engaged in sexually explicit acts lacking serious literary, artistic, political, or scientific value.

247. The xAI Defendants possessed AI-generated visual depictions of minors—Plaintiffs and the Class—engaged in sexually explicit conduct, in an obscene manner, or engaged in sexually explicit acts lacking serious literary, artistic, political, or scientific value.

248. The xAI Defendants distributed the AI-generated visual depictions of minors—Plaintiffs and the Class—engaged in sexually explicit conduct, or in an obscene manner, or engaged in sexually explicit acts lacking serious literary, artistic, political, or scientific value directly to Grok users on the standalone Grok app.

249. Plaintiffs and the Classes suffered personal injury as a result of the Defendants' violation of 18 U.S.C. § 2252A(f)(1).

250. Plaintiffs intend to prove actual damages as a result of the Defendants' conduct.

251. At minimum, Plaintiffs and the Classes and Subclass intend to seek injunctive relief, and such other relief as the Court deems appropriate.

252. The Defendants' conduct, as described above, was intentional, reckless, malicious, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Classes, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**COUNT 6**
**Trafficking Victims Protection Act, Beneficiary Liability**
**18 U.S.C. §§ 1595, 1594, 1591(a)(2)**
**(on behalf of all Plaintiffs and all Classes against all Defendants)**

253.     Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 6 are made against all Defendants.

254.     27.Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

255.     28.Defendants knowingly and intentionally benefitted, financially and by receiving things of value, from participating in, assisting, supporting, and facilitating, and from conspiring to participate in, assist, support, and facilitate an illegal sex-trafficking venture targeting minors that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2)§§ 1591(a)(2), 1594.

256.     29.Defendants knew, and were in reckless disregard of the fact, that their customers and userbase used the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, and obtain and advertise minors for purposes of causing commercial sex acts, namely, the production, possession, and distribution of CSAM, as defined by 18 U.S.C. § 2256(8), in violation of 18 U.S.C. § 1591(a)(1). Defendants' customers and users engaged in sex acts, namely, the production, possession, and distribution of CSAM in exchange for something of value, namely, the exchange of bartered CSAM from other like-minded child sex predators online.

257.     Specifically, the perpetrators in Jane Does 1-5's cases obtained the Plaintiffs' images depicting them as minors, used Defendants' AI models to produce CSAM with their identifying features, and then trafficked these images over online platforms, including Discord, Telegram, and other social media platforms, advertising the CSAM images of Jane Does 1-5 for the purposes of exchanging these images with other child sex predators for additional CSAM depicting other minors.

258.     30.Defendants and their employees and agents had actual knowledge that they were facilitating a sex trafficking venture to recruit, solicit, entice, coerce, harbor, or obtain Jane Does 1-3, as well as other Members of the Class, into commercial sex acts, namely the production, possession, and distribution of their CSAM, in violation of 18 U.S.C. § 1591(a)(1).obtain and advertise minors for purposes

of causing commercial sex acts, namely, the production, possession, and distribution of CSAM, as defined by 18 U.S.C. § 2256(8), in violation of 18 U.S.C. § 1591(a)(1), in exchange for something of value.

31.Defendants knew or should have known that they received value for their ongoing business practices that allowed their AI image- and video-making products to become a means of the sex trafficking venture's online child exploitation, namely, the production, possession, and distribution of CSAM, as defined by 18 U.S.C. § 2256(8), despite the risk to children.

259.    32.Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

260.    33.By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1594, 1595, Defendants are liable to Jane Does 1-3 1-5 and the other Members of the Class Classes for the damages they sustained and reasonable attorneys' fees.

261.    34.By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1594, 1595, Defendants are liable to Jane Does 1-3 1-5 and other members of the Class Classes for punitive damages.

**COUNT VCalifornia's Statutory Right of Publicity7**
**Cal. Civ. Code § 33441708.86**
**(on behalf of all Plaintiffs and the Class all Classes against all Defendants)**

262.    35.Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count V 7 are made against all Defendants.

263.    36.Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

37.    California's Right of Publicity Statute, Cal. Civ. Code § 3344, protects minors from the unauthorized appropriation of the minor's identity without prior parental or guardian consent by another for commercial gain. Cal. Civ. Code § 3344(a)(1).

38. California's Right of Publicity Statute allows recovery of "an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by them as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages." Cal. Civ. Code § 3344(a)(1).

39. Defendants knowingly used Plaintiffs' and Class members' likenesses to advertise, sell, or solicit paid subscriptions to Grok.

40. Defendants did not—nor could not—obtain Plaintiffs' or Class members' parents or guardians' consent to use their likenesses for the proliferation of CSAM featuring reasonably identifiable minors.

41. Plaintiffs and Class members were harmed by Defendants' use of their likenesses. As a result of Defendants' conduct, Plaintiff and Class members have severe emotional distress, harassment, loss of privacy, and are at substantial risk of future harm, including stalking.

42. Defendants' actions were a substantial factor in causing Plaintiff and Class members' harm.

43. The creation of CSAM was not used in conjunction with news, public affairs, a sports broadcast or account, or a political campaign, and was patently illegal given the content.

264. Plaintiffs on behalf of themselves and the Classes bring claims based on Defendants' violation of Cal. Civ. Code § 1708.86, which prohibits (1) creating and intentionally disclosing digitized sexually explicit material portraying a minor, or (2) intentionally disclosing digitized sexually explicit material portraying a minor that the defendant did not create, and (3) knowingly facilitating and recklessly aiding or abetting conduct prohibited by subsections (1) or (2).

265. Defendants' AI technology produced digitized sexually explicit material portraying minors as defined by Cal. Civ. Code § 1708.86, using Plaintiffs' and the Class's real images, generating digitized sexually explicit material portraying minors.

266. Defendant xAI intentionally disclosed these digitized sexually explicit material portraying minors via the standalone Grok app to Grok users.

267. Defendants xAI and Stability AI created their AI technologies with the capabilities to create AI-generated CSAM.

268. Defendants xAI and Stability AI knowingly facilitated or recklessly aided and abetted its users to create and disclose digitized sexually explicit material portraying minors, using Plaintiffs' and the Class's real images.

269. Defendants xAI and Stability AI engaged in despicable conduct with a willful and knowing disregard of Plaintiffs' rights and safety. Defendants were aware of the probable harmful consequences of their conduct and deliberately failed to avoid those consequences by creating and distributing—and allowing its users to create and distribute—digitized sexually explicit material portraying minors, using Plaintiffs' and the Class's real images.

270. Defendants xAI and Stability AI enjoyed substantial monetary gain from creating and distributing—and allowing its users to create and distribute—digitized sexually explicit material portraying minors, using Plaintiffs' and the Class's real images through the monetization and commercialization of their respective AI models.

271. Plaintiffs and the Classes suffered personal injury as a result of Defendants' violation of Cal. Civ. Code § 1708.86.

272. Plaintiffs and the Classes intend to seek actual or statutory damages.

273. Cal. Civ. Code § 1708.86(f)(1) provides that a plaintiff may recover:

(A) An amount equal to the monetary gain made by the defendant from the creation and disclosure of the digitized sexually explicit material. (B) One of the following: (i) Economic and noneconomic damages proximately caused by the disclosure of the digitized sexually explicit material, including damages for emotional distress. (ii) Upon request of the plaintiff at any time before the final judgment is rendered, the plaintiff may instead recover an award of statutory damages for all unauthorized acts involved in the action, with respect to any one work, as follows: (I) A sum of not less than one thousand five hundred dollars ($1,500) but not more than fifty thousand dollars ($50,000). (II) If the unlawful act was committed with malice, the award of statutory damages may be increased to a maximum of two hundred fifty thousand dollars ($250,000). (C) Punitive damages. (D) Reasonable attorney's fees and costs. (E) Any other available relief, including injunctive relief.

274. Defendants' conduct, as described above, was intentional, reckless, malicious, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

<strong><s>COUNT VI</s><span style="color:blue">COUNT 8</span></strong><br>
<strong>California's Unfair Competition Law ("UCL")</strong><br>
<strong>Cal. Bus. & Prof. Code § 17200, <em>et seq.</em></strong><br>
<strong>(on behalf of all Plaintiffs and <s>the Class</s> all Classes against all Defendants)</strong>

275. <s>44.</s>Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count <s>VI</s> 8 are made against all Defendants.

276. <s>45.</s>Plaintiffs bring this claim on behalf of themselves and the members of the proposed <s>Class</s> Classes against Defendants for violations of California's UCL, Cal. Bus. & Prof. Code § 17200, <em>et seq</em>.

277. <s>46.</s>The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising" Cal. Bus. & Prof. Code § 17200.

278. <s>47.</s>Defendants have committed, and continue to commit, acts of unlawful business practices by violating the following statutes, as alleged more fully herein:

a. 18 U.S.C. § 2251(a), by knowingly using Plaintiffs' real images to engage those minors in sexually explicit conduct as defined by 18 U.S.C. § 2256(2), as alleged in Count 1.

b. <s>a.</s>18 U.S.C. § 2252A(a)(7), by knowingly producing, with intent to distribute, CSAM featuring identifiable minors, including Plaintiffs, using <s>Grok</s>Defendants' AI models, as alleged in Count <s>I;</s>2;

c. Cal. Civ. Code § 1708.86, by generating digitized sexually explicit material portraying minors, including Plaintiffs, using Defendants' AI models, as alleged in Count 9.

<s>b. 18 U.S.C. § 2252A(a)(2), by knowingly distributing AI-generated CSAM from xAI servers over the internet, a means of interstate commerce, to paying customers and customers of third-party middlemen licensees, as alleged in Count II;</s>

<s>c. 18 U.S.C. § 2252A(a)(5)(B), by knowingly possessing AI-generated CSAM on xAI servers after Grok produced such material and before distributing it to customers, as alleged in Count III; and</s>

<s>d. 18 U.S.C. §§ 1591(a)(2), 1594, and 1595, by knowingly and intentionally benefitting, financially, from participating in, assisting, supporting, and facilitating a sex-trafficking venture targeting minors, as alleged in Count IV.</s>

279. 1.Each of the foregoing statutory violations constitutes an independent predicate "unlawful" act within the meaning of Cal. Bus. & Prof. Code § 17200.

280. 2.Defendants' conduct, as alleged herein, is unfair because the harm it causes to Plaintiffs, the Class, and the general public substantially outweighs any utility or benefit derived from that conduct

281. 3.Defendants deliberately designed, developed, and released Grok their respective AI models without implementing industry-standard safeguards to prevent the creation and dissemination of CSAM featuring reasonably identifiable minors.

282. 4.The gravity of the harm inflicted by Defendants' practices vastly outweighs any purported benefit of xAI Defendants' "spicy mode" or other uncensored content features on either respective AI model. No legitimate business interest is served by designing an AI image-generation tool to produce CSAM.

283. 5.Defendants' violations of the UCL, through its unlawful and unfair business practices, are ongoing and present a continuing threat that Grok Defendants' respective AI models will continue to create and/or disseminate CSAM featuring reasonably identifiable minors. Plaintiffs and Class members Members have suffered severe emotional distress, harassment, loss of privacy, and are at substantial risk of future harm, including stalking.

284. 6.Pursuant to the UCL, Plaintiffs and Class members Members are entitled to preliminary and permanent injunctive relief enjoining Defendants from further engaging in this unfair competition, as well as disgorgement to Plaintiff and the proposed Class Classes of all of Defendants' revenues that were wrongfully obtained from them as a result of its unfair competition, or such portion of those revenues as the Court may find equitable.

**COUNT 9**
**Tenn. Code §§ 39-17-1902–1904**
**(on behalf of Jane Does 1–3 and the Tennessee Subclass against all Defendants)**

285. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 9 are made against all Defendants.

286. Plaintiffs bring this Count individually and on behalf of the Tennessee Subclasses they seek to represent.

287. Plaintiffs on behalf of themselves and the Tennessee Subclasses bring claims based on Defendants' violation of Tenn. Code §§ 39-17-1902–1904, which prohibits intentionally disclosing without the consent of the depicted individual, intimate digital depictions knowing or recklessly disregarding that the depicted individual had not consented to such disclosure.

288. Defendants intentionally disclosed without the consent of Plaintiffs or the Tennessee Subclasses intimate digital depictions of Plaintiffs and the Tennessee Subclasses as minors knowing or recklessly disregarding that Plaintiffs and the Subclasses had not consented to such disclosure.

289. Defendants enjoyed substantial monetary gain from creating and distributing—and allowing its users to create and distribute—digitized sexually explicit material portraying minors, using Plaintiffs' and the Tennessee Subclasses's real images through the monetization and commercialization of Grok and the Stable Diffusion models.

290. Plaintiffs and the Tennessee Subclasses suffered personal injury as a result of Defendants' violation of Tenn. Code §§ 39-17-1903.

291. Plaintiffs and the Subclasses intend to seek actual or statutory damages.

292. Tenn. Code §§ 39-17-1903 provides that a plaintiff may recover any of the following: (1) the defendant's monetary gain "from the creation, development, or disclosure of the intimate digital depiction;" either actual damages or "[l]iquidated damages in the amount of one hundred fifty thousand dollars ($150,000);" punitive damages; costs, including reasonable attorneys' fees; as well as "order equitable relief, including a temporary restraining order, a preliminary injunction, or a permanent injunction ordering the defendant to cease display or disclosure of the intimate digital depiction."

293. Defendants' conduct, as described above, was intentional, reckless, malicious, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Tennessee Subclasses, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**COUNT VII COUNT 10**
**Strict Liability – Design Defect**
**(on behalf of all Plaintiffs and the Class all Classes against all Defendants)**

294. 7.Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count VII 10 are made against all Defendants.

295. 8.Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

296. 9.At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from Grok's their respective AI models' creation of AI-generated CSAM of the Plaintiffs and the proposed class.

297. 10.Defendants' Grok is AI models are designed and intended to be generative AI photo-and-image-generation tools. Defendants developed their AI models with the capabilities to create AI-generated CSAM.

298. 11.Defendants' Grok is Defendant xAI's AI models are distributed and sold to the public through retail channels (i.e., the Apple App "Store" and the Google Play "Store") and through paid subscriptions.

299. Defendant Stability AI's models are distributed to the public through its own websites and AI model distribution hubs such as Civitai or HuggingFace.

300. 12.Defendants' Grok is AI models are marketed and advertised to the public for the personal use of the end-user.

301. 13.Defendants' defectively designed Grok their AI models to allow users to create AI-generated CSAM depicting real minors.

302. 14.The defects in the design of the Defendants' Grok Defendant xAI's AI models existed prior to the release of Grok these models to the public, and there was no substantial change to any of the Defendants' Grok Defendant xAI's AI models between the time of their upload by each Defendant xAI to public or retail channels (e.g., the App Store or Google Play) and the time of their distribution..

303. The defects in the design of Defendant Stability AI's AI models existed prior to the release of these models to the public. Any changes made to Defendant Stability AI's models by users who employed

them as base models for third-party applications were not substantial, and the underlying defects allowing such content to be created existed prior to release.

304. ~~15.~~The users who created the AI-generated CSAM of Plaintiffs and the proposed ~~class~~ Classes used ~~Grok~~ the AI models as intended.

305. ~~16.~~Defendants failed to test the safety of the features it developed and implemented for use on ~~Grok~~ their AI models to prevent AI-generated CSAM.

306. Defendants' ~~Grok is~~ AI models are defective in design and pose a substantial likelihood of harm for the reasons set forth herein, because ~~Grok fails~~ these models fail to meet the safety expectations when used in an intended or reasonably foreseeable manner. ~~17.    Defendant markets, promotes, and advertises Grok as capable of creating "spicy" and "NSFW" content.~~

307. Defendant xAI markets, promotes, and advertises its AI models as capable of creating "spicy" and/or "NSFW" content.

308. Defendant Stability AI reintroduced NSFW content to its training materials between SD 1.0 and SDXL, after SD 2.0—which had excluded NSFW content from its training materials—was less commercially viable.

309. ~~18.~~Alternative designs were available that would reduce the output of AI-generated CSAM.

310. ~~19.~~The emotional and economic injuries of Plaintiffs and the proposed ~~class~~ Classes were reasonably foreseeable to Defendants at the time of ~~Grok's~~ their AI models' development, design, advertising, marketing, promotion, and distribution.

311. ~~20.~~Plaintiffs and the proposed ~~class~~ Classes were injured as a direct and proximate result of the Defendants' defective designs as described herein. The defective design of ~~Grok~~ the Defendants' AI models was a substantial factor in causing harms to Plaintiffs and the proposed ~~class~~Classes.

312. ~~21.~~Defendants' conduct, as described above, was intentional~~, fraudulent~~, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**COUNT ~~VIII~~11**
**Negligence – Design Defect**
**(on behalf of all Plaintiffs and ~~the Class~~ all Classes against all Defendants)**

313.    ~~22.~~Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count ~~VIII~~11 are made against all Defendants.

314.    ~~23.~~Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

315.    ~~24.~~At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, ~~controlled,~~ sold, supplied, distributed, and benefitted from ~~Grok's~~ their respective AI models' creation of AI-generated CSAM of the Plaintiffs and the proposed class.

316.    ~~25.~~Defendants' ~~Grok is~~ AI models are designed and intended to be ~~a~~ generative AI photo-and-image-generation ~~tool~~tools.

317.    ~~26.~~Defendants knew, or by the exercise of reasonable care, should have known that ~~Grok~~ their AI models posed risks of creating AI-generated CSAM featuring real minors.

318.    ~~27.~~Defendants owed Plaintiffs and the proposed ~~Class~~ Classes a duty to exercise reasonable care in the design, development, training, deployment, and operation of ~~Grok~~ their AI models so as to prevent ~~Grok~~ these models from being used to create, generate, or distribute child sexual abuse material ("CSAM") depicting real minors.

319.    ~~28.~~Defendants knew that users could use ~~Grok~~ their AI models to create AI-generated CSAM featuring real minors' faces.

320.    ~~29.~~Defendants breached their duty by failing to use reasonable care in the design of ~~Grok~~ their AI models by negligently designing ~~it~~them to allow for the creation of AI-generated CSAM.

321.    ~~30.~~A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

322.    ~~31.~~The emotional and economic injuries of Plaintiffs and the proposed ~~class~~ Classes were reasonably foreseeable to Defendants at the time of ~~Grok's~~ their AI models' development, design, advertising, marketing, promotion, and distribution.

323. 32.As a direct and proximate result of Defendants' Grok's AI models' defective design, Plaintiffs suffered serious injuries.

324. 33.Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**COUNT ~~IX~~12**
**Negligent Undertaking**
**(on behalf of all Plaintiffs and ~~the Class~~ all Classes against all Defendants)**

325. 34.Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count ~~IX~~ 12 are made against all Defendants.

326. 35.Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

327. 36.Defendants created ~~Grok~~ their AI models to generate sexually explicit content.

328. 37.Defendants should have recognized that effective safety measures were needed to prevent the ~~prevention of~~ creation and distribution of AI-generated CSAM depicting real minors, as occurred with Plaintiffs and the proposed class.

329. 38.Defendants could have avoided Plaintiffs' injuries with minimal cost, including, for example, incorporating safety features to prevent the creation and distribution of AI-generated CSAM depicting real minors.

330. 39.Imposing a duty on Defendants would benefit the community at large.

331. 40.Imposing a duty on Defendants would not be burdensome to them because they have the technological and financial means to avoid the risks of harm to Plaintiffs and the proposed class.

332. 41.Plaintiffs reasonably relied on Defendants exercising reasonable care in undertaking to prevent the creation and distribution of AI-generated CSAM depicting real minors.

333. 42.Defendants breached their duty of undertaking by failing to use reasonable care to prevent the creation and distribution of AI-generated CSAM depicting real minors.

334. 43.Defendants' failure to exercise reasonable care increased the risk of, and was a substantial factor in causing, harm to Plaintiffs and the proposed class.

335. 44.The conduct of Defendants, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of minors.

**COUNT X13**
**Negligence Per Se**
**(on behalf of all Plaintiffs and the Class all Classes against all Defendants)**

336. 45.Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count X 13 are made against all Defendants.

337. 46.Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

338. 47.At all times, Defendants had an obligation to comply with applicable statutes and regulations, including but not limited the PROTECT Our Children Act (*see* 18 U.S.C. § 2258A), as well as other federal lawsto the 18 U.S.C. § 2251(a); 18 U.S.C. § 2255(a); 18 U.S.C. § 2258A; 18 U.S.C. §§ 2252A(a)(2), (5)(B), (a)(7), and (f)(1); and 18 U.S.C. §§ 1591, 1594, and 1595.

339. 48.Defendants owed a heighted heightened duty of care to ensure that their safety procedures were effective and would prevent the creation and distribution of AI-generated CSAM depicting real minors.

340. 49.Defendants failed to meet the requirements of 18 U.S.C. § 2258A by not reporting to NCMEC the violations of child pornography laws that they suspected to be in existence within Groktheir AI models.

341. 50.Plaintiffs and the proposed class Classes are within the class of persons that this statute is these statutes are intended to protect.

342. 51.Plaintiffs' injuries are the type of harm that this statute is intended to prevent.

343. 52.Violations of the foregoing statute constitutes statutes constitute negligence *per se*.

344. 53.As a direct and proximate result of Defendants' statutory violations, Plaintiffs suffered serious injuries, including but not limited to emotional distress, reputation reputational harm, and pain and suffering.

345. 54.The conduct of Defendants, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of minors.

**COUNT XI14**
**Negligent Infliction of Emotional Distress**
**(on behalf of all Plaintiffs and the Class all Classes against all Defendants)**

346. 55.Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count XI 14 are made against all Defendants.

347. 56.Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

348. 57.At all relevant times, Defendants owed Plaintiffs and the proposed class Classes a duty to exercise reasonable care in the design, development, training, deployment, and operation of their generative AI models so as to prevent Grok these models from being used to create, generate, or distribute child sexual abuse material ("CSAM") depicting real minors.

349. 58.This duty arose from the foreseeable risk that Defendants' generative AI technology, which was specifically designed and marketed to produce photorealistic imagery from text-based prompts and to engage in "digital undressing," would be used to generate sexually explicit depictions of real minors.

350. 59.Defendants were on actual and constructive notice of this risk because, among other things: (i) Defendants deliberately designed and marketed Grok's their AI models' capability to produce "spicy," "NSFW," and uncensored content, including nudity; (ii) xAI Defendants' own system prompts instructed the model to "assume good intent" when receiving prompts referencing "teenagers" and "girls" and imposed "no restrictions" on fictional adult content with dark or violent themes; and (iii) xAI Defendants received multiple direct reports that Grok was being used to digitally alter photographs of real minors into sexually explicit images, yet failed to take adequate remedial action; and (iv) Stability AI Defendants knowingly and deliberately designed their next generation AI models, like SDXL, to produce

- 65 -

more "NSFW" content in order to generate a wider userbase and rapid adoption of their open-weight AI model.

351. 60. Defendants breached their duty of care by, among other acts and omissions: (i) designing and releasing Grok and Grok Imagine their AI models without adequate safeguards to prevent the generation of CSAM; (ii) marketing and promoting the ability of Grok their AI models to produce sexualized and "NSFW" content, including in the case of the xAI Defendants through public demonstrations by Defendants' principal, Elon Musk; (iii) failing to implement or enforce content-moderation policies sufficient to detect and prevent the generation and distribution of CSAM; and (iv) continuing to profit from Grok's their AI models' capabilities by placing image-generation features behind a paid subscription rather than disabling the functionality that enabled the creation of CSAM.

352. 61. Plaintiffs and the proposed class Classes were direct victims of Defendants' negligent conduct. Defendants-' duty ran to Plaintiffs and the proposed class Classes as the foreseeable subjects of AI-generated CSAM produced by Grok their AI models. Plaintiffs' real photographs were ingested by Defendants' technology and morphed Plaintiffs' real photos into sexually explicit depictions without their knowledge or consent. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs have suffered severe emotional distress.

As a direct and proximate result of Defendants' negligent conduct, Plaintiffs have suffered severe emotional distress.

**COUNT XII15**
**Intentional Infliction of Emotional Distress**
**(on behalf of all Plaintiffs and the Class all Classes against all Defendants)**

353. 62. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count XII 15 are made against all Defendants.

354. 63. Defendants Defendant xAI engaged in extreme and outrageous conduct by (1) failing to implement safeguards to prevent the creation of CSAM where Plaintiffs' and Class Members are reasonably identifiable; (2) creating a process that permits Grok their AI models to create CSAM where real minors are reasonably identifiable; and (3) creating a process whereby Grok disseminates their AI models disseminate CSAM where real minors are reasonably identifiable; and (4) failing to design Grok to delete its own X posts with CSAM where real minors are reasonably identifiable. This extreme and outrageous

conduct is beyond all bounds of decency. are reasonably identifiable. This extreme and outrageous conduct is beyond all bounds of decency.

355.    Defendant Stability AI engaged in extreme and outrageous conduct by (1) failing to implement safeguards to prevent the creation of CSAM where Plaintiffs and Class Members are reasonably identifiable; (2) creating a process that permits their AI models to create CSAM where real minors are reasonably identifiable; (3) reintroducing NSFW content to the training data for SDXL after removing it for SD 2.0; (4) creating a process whereby their users can modify their AI models to disseminate CSAM where real minors are reasonably identifiable. This extreme and outrageous conduct is beyond all bounds of decency.

356.    64. Defendants intended to cause, or disregarded a substantial probability of causing, severe emotional distress to individuals who are depicted in CSAM where they are reasonably identifiable.

357.    65. Defendants caused Plaintiffs and Class members Members severe emotional distress. Because of Defendants' conduct, Plaintiffs and Class members Members have suffered severe emotional distress, harassment, loss of privacy, and are at substantial risk of future harm, including stalking.

**COUNT XIII 16**
**Public Nuisance**
**(on behalf of all Plaintiffs and the Class all Classes against all Defendants)**

358.    66. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count XIII 16 are made against all Defendants

359.    67. Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

360.    68. A public nuisance is "an unreasonable interference with a right common to the general public," and "[c]ircumstances that may sustain a holding that an interference with a public right is unreasonable include" conduct which "involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience;" conduct "proscribed by a statute, ordinance or administrative regulation;" or conduct "of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." Restatement (Second) of Torts § 821B (1979).

361.    69.Defendant xAI has significantly interfered with the public peace, comfort, and convenience by permitting Grok their AI models to create and disseminate of AI-generated CSAM featuring reasonably identifying minors by Grok, as the public has a right to be free from such patently illegal images.

362.    Defendant Stability AI has significantly interfered with the public peace, comfort, and convenience by permitting their AI models to be base models for the creation and dissemination AI-generated CSAM featuring reasonably identifying minors, as the public has a right to be free from such patently illegal images.

363.    70.Defendant xAI has also unreasonably interfered with a right common to the public by creating and disseminating AI-generated CSAM featuring reasonably identifying minors, as it is proscribed by federal statutes, namely 18 U.S.C. § 2251(a), 2252A(a)(2), (5)(B) and 18 U.S.C. §§ 1591(a)(2), 1594, 1591(d), and 1595.

364.    71.Defendant xAI has further unreasonably interfered with a right common to the public by creating and disseminating AI-generated CSAM featuring reasonably identifying minors on the internet, creating permanent and long-lasting effects as these images will continue to spread and proliferate.

365.    72.The societal harm caused by xAI's Defendants' generative AI CSAM includes normalization and desensitization, creating a gateway to child sex abuse offending, and corruption of youth.[39][81]

366.    73.Normalization and Desensitization: AI CSAM risks lowering psychological and social barriers to more extreme content. By normalizing child sexual exploitation, it can degrade users' moral and emotional inhibitions, reinforcing distorted beliefs and reducing perceived harm. In other words, in a world where creation and distribution of this kind of content is accepted as "normal" – by, for example, a major corporation building its business model around this sexualized content with the corporation's CEO making it into a "trend" online as if it were a joke, society becomes desensitized to the severe and ongoing harm the content actually causes, to victims whose photos are used to generate such content, and to society at large, in terms of respect for the privacy and dignity of all persons.

[39][81] Caoilte Ó Ciardha, John Buckley, Rebecca S. Portnoff, "AI Generated Child Sexual Abuse Material -- What's the Harm?" Cornell University, Computer Science, Computers and Society; https://arxiv.org/abs/2510.02978 (October 3, 2025).

- 68 -

367. ~~74.~~Gateway to Child Sex Abuse Offending: AI CSAM can serve as a behavioral bridge into offending through two mechanisms: (1) Escalation, where individuals progress from legal adult content to CSAM as tolerance builds toward more extreme material; and (2) Inhibition erosion, where individuals with a sexual interest in children, who might otherwise avoid offending, are drawn in by the perceived safety, legality, or personalization of AI-generated content. Both processes may be reinforced by online communities (such as the Discord trading posts ~~Plaintiffs'~~ Does 1-3's perpetrator used) that normalize or encourage continued engagement.

368. ~~75.~~Corruption of Youth: Adolescents are using AI tools to generate explicit images of peers, often without understanding the full consequences. This creates risks of coercion, abuse, and long-term psychological harm, while also implicating minors in digital sexual exploitation.

369. ~~76.~~Defendants knew, or should have known, that the design and promotion of ~~Grok~~ their AI models without the appropriate guardrails to prevent the creation and dissemination of AI-generated CSAM featuring reasonably identifying minors would create a public nuisance.

370. ~~77.~~As well as harming the public by creating and disseminating AI-generated CSAM featuring reasonably identifying minors, ~~Grok has~~ Defendants' AI models have particularly injured Plaintiffs and Class Members who are depicted in these illegal images.

**PRAYER**

WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the ~~Class~~Classes, request that this Court award relief against Defendants as follows:

1. An order certifying the ~~Class~~ Classes and Tennessee Subclasses designating Plaintiffs as Class Representatives and their counsel as Class Counsel;

2. Awarding Plaintiffs and the proposed ~~Class~~ Classes statutory damages or actual damages at their election, restitution, disgorgement, attorneys' fees and costs, and any other relief that may be permitted by law or equity pursuant to the claims for relief;

3. Permanently enjoining xAI Defendants and Stability AI Defendants from engaging in the illegal conduct alleged herein;

4. Awarding Plaintiffs and the proposed ~~Class~~ Classes pre-judgment and post-judgment interest pursuant to the claims for relief;

5.      Awarding Plaintiffs and the proposed ~~Class~~ Classes costs, expenses, and attorneys' fees as permitted by law; and

6.      Awarding Plaintiffs and the proposed ~~Class~~ Classes further relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial for all claims so triable.

Dated:  ~~March 16~~July 7, 2026

Respectfully submitted,

By: /s/ ~~Vanessa Baehr-Jones~~Annika K. Martin
      Annika K. Martin

    ~~Vanessa Baehr-Jones~~

Annika K. Martin (*pro hac vice ~~forthcoming~~*)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
akmartin@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  212.355.9500

Mark P. Chalos (*pro hac vice ~~forthcoming~~*)
Betsy A. Sugar (*pro hac vice ~~forthcoming~~*)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
mchalos@lchb.com
bsugar@lchb.com
222 2nd Ave. S., Suite 1640
Nashville, TN 37201
Telephone:  615.313.9000

Michelle A. Lamy (SBN 308174)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
mlamy@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000

Vanessa Baehr-Jones (SBN 281715)
**BAEHR-JONES LAW PC**
vanessa@advocatesforsurvivors.com
4200 Park Boulevard, No. 413
Oakland, CA 94602
Telephone:  510.500.9634

*Attorneys for Plaintiffs and the proposed Class*