Isaac D. Chaput (Bar No. 326923)
Cecilia M. Bobbitt (Bar No. 345472)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com
cbobbitt@cov.com

Emily Johnson Henn (Bar No. 269482)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4700
ehenn@cov.com

*Attorneys for Defendants Stability AI, Inc. and Stability AI U.S. Services Corporation*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JANE DOE 1, et al.,

Plaintiffs,

v.

X.AI CORP., et al.,

Defendants.

Civil Case No.: 5:26-cv-2246-PCP

**STABILITY'S NOTICE OF MOTION AND PARTIALLY UNOPPOSED MOTION TO SEVER BASED ON IMPROPER JOINDER OF DEFENDANTS (Fed. R. Civ. P. 20, 21)**

Hearing Date: December 10, 2026
Hearing Time: 10:00 a.m.
Hearing Place: Courtroom 8 – 4th Floor

Hon. P. Casey Pitts

**Table of Contents**

STATEMENT OF REQUESTED RELIEF ........ 1
STATEMENT OF ISSUE TO BE DECIDED ........ 1
MEMORANDUM OF POINTS AND AUTHORITIES ........ 1
INTRODUCTION ........ 1
BACKGROUND ........ 2
A. Plaintiffs' Alleged Injuries ........ 2
B. Defendants' Generative AI Models ........ 3
LEGAL STANDARD ........ 5
ARGUMENT ........ 6
I. Plaintiffs' Claims Against Stability Have Been Improperly Joined with Those Against X.AI ........ 6
A. The TN Does' Claims Against Stability and X.AI Arise from Separate Transactions or Occurrences. ........ 6
B. Any Common Questions Plaintiffs May Identify Do Not Solve the Absence of a Common Transaction. ........ 8
II. The Court Should Exercise Its Discretion to Sever for Reasons of Judicial Economy and to Prevent Unfair Prejudice to Stability. ........ 8
CONCLUSION ........ 10

# Table of Authorities

## Cases

*Bias v. Wells Fargo & Co.*, 2012 WL 2906664 (N.D. Cal. July 13, 2012) .......... 5, 7

*Cambronne, Inc. v. Anthropic PBC*, 834 F. Supp. 3d 831 (N.D. Cal. 2026) .......... 5, 6, 7

*Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000) .......... 5, 8

*Corley v. Google, Inc.*, 316 F.R.D. 277 (N.D. Cal. 2016) .......... 5, 7

*Coughlin v. Rogers*, 130 F.3d 1348 (9th Cir. 1997) .......... 5, 6

*Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371 (9th Cir. 1980) .......... 5, 7, 8

*Renati v. Wal-Mart Stores, Inc.*, 2019 WL 5536206 (N.D. Cal. Oct. 25, 2019) .......... 7

*SEC v. Leslie*, 2010 WL 2991038 (N.D. Cal. July 29, 2010) .......... 5

*Visendi v. Bank of Am., N.A.*, 733 F.3d 863 (9th Cir. 2013) .......... 9

*Wynn v. Nat'l Broad. Co., Inc.*, 234 F. Supp. 2d 1067 (C.D. Cal. 2002) .......... 9

## Rules

Fed. R. Civ. P. 20 .......... 4, 5

Fed. R. Civ. P. 21 .......... 5

## STATEMENT OF REQUESTED RELIEF

Defendants Stability AI U.S. Servs. Corp. and Stability AI, Inc. ("Stability") respectfully move for an order severing all claims asserted against Stability from those asserted against X.AI Corp., X.AI LLC, and X.AI Holdings LLC ("X.AI"). Plaintiffs improperly joined Stability and X.AI under Federal Rule of Civil Procedure 20(a)(2), and even if joinder were proper, the Court should exercise its discretion to sever under Rule 21. X.AI consents to the relief sought in this Motion.

## STATEMENT OF ISSUE TO BE DECIDED

Whether the Court should sever Plaintiffs' claims against Stability from those asserted against X.AI where Plaintiffs have not alleged that the claims against Stability and X.AI arise from the same transaction or occurrence, and where, for the reasons explained below, litigating those claims together would be inefficient and unfairly prejudicial to Stability.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Five Jane Doe Plaintiffs, residents of Tennessee, Wyoming, and Wisconsin, have brought a single class action lawsuit against X.AI and Stability (collectively, "Defendants"), alleging that Defendants' generative AI models were used to produce child sexual abuse material ("CSAM") depicting them. X.AI owns and operates a proprietary AI model, Grok. Stability developed and released certain versions of the open-weight Stable Diffusion models. Only three of the five Plaintiffs—Jane Does 1–3—allege any facts relating to Stability. Compl. ¶¶ 132–57. Jane Does 4 and 5 exclusively allege that depictions of them were generated using X.AI. Compl. ¶¶ 158–90. Plaintiffs assert sixteen causes of action in total. Two of these counts, under Masha's Law for distribution and possession of CSAM, are brought exclusively against X.AI. Plaintiffs have defined four putative plaintiff classes and subclasses, split by defendant: an X.AI Class, a Tennessee X.AI Subclass, a Stability AI Class, and a Tennessee Stability AI Subclass. *Id.* ¶ 194.

The only link between all Plaintiffs' claims against the two Defendant groups is that they allege harm from generative AI models. Plaintiffs cannot show that their claims against Stability arise from the same transaction, occurrence, or series of transactions or occurrences as their claims against X.AI,

particularly when Plaintiffs themselves expressly allege that Stability and X.AI have different AI models, different business practices, and different platforms. Nor can Plaintiffs show that they are alleging relief in the alternative: two plaintiffs (Jane Does 4 and 5) allege only facts that relate to X.AI. The remaining plaintiffs allege that the perpetrator at issue used Grok to generate certain CSAM and, separately, used a third-party application to generate other CSAM. That third-party application allegedly used Stability's open-weight models to power its text-to-image functionality. And, in any event, lumping Stability in with X.AI will prejudice Stability and create vast inefficiencies. The Court should sever Plaintiffs' claims against Stability from those against X.AI.

## BACKGROUND[1]

### A. Plaintiffs' Alleged Injuries

Originally, this case was brought only by Jane Does 1–3 ("TN Does") against X.AI. *See* ECF No. 1. The TN Does claimed that "Grok morphed" photos of them to generate CSAM, *id.* ¶ 82, that the application used to generate CSAM of them "relied on Grok's image- and video-producing tools to generate the unlawful content," *id.* ¶ 94, and that the "application was a licensee of xAI, or had otherwise purchased its access to Grok, and was used as a cut-out or middleman so that xAI could intentionally and knowingly profit from the sale of access to the Grok model for illicit and unlawful purposes, such as the production of CSAM, all while attempting to shield itself from liability," *id.* ¶ 95.

Plaintiffs later filed the operative First Amended Complaint ("Complaint"), ECF No. 26, adding Jane Doe 4 (a Wyoming resident) and Jane Doe 5 (a Wisconsin resident). Plaintiffs allege that each of them was injured by AI-generated CSAM allegedly created by one or more of Defendants' AI models. Compl. ¶¶ 5–6, 14–18. Only three of them—the TN Does—allege any facts relating to Stability. While certain headings in the Complaint suggest that Jane Does 4 and 5 bring claims against "all defendants," their factual *allegations* are solely against X.AI, based on the conduct of two separate individuals who allegedly used Grok to generate CSAM depicting them. Compl. ¶¶ 158–90. The Jane Doe 4 and 5 allegations have nothing to do with Stability.

[1] In light of the early procedural stage of this case, Stability takes the well-pleaded allegations in the Complaint as true for purposes of this Motion only.

The TN Does allege that a single perpetrator generated CSAM of each of them based on actual images of them, using one or more third-party mobile phone applications. Compl. ¶¶ 132–57. Jane Doe 2 provides the most specificity in her allegations, stating that the perpetrator used *multiple* AI tools to generate CSAM. Specifically, she alleges that "the AI tool used to generate the CSAM was xAI," and that "the perpetrator *also* used an application on his phone to produce CSAM." *Id.* ¶ 147 (emphasis added). She goes on to allege that this second application "relied on Stability AI's image-producing tools to generate the unlawful content." *Id.* ¶ 148. The amendment also removed many of the allegations relating to Grok, including that "[t]he application the perpetrator used to create the AI CSAM of Plaintiffs relied on Grok's image- and video-producing tools to generate the unlawful content." *See* ECF No. 26-1, at 38 (redlined paragraph labeled 5). The TN Does' new theory of the case is that a single perpetrator used multiple applications to generate CSAM depicting them. Certain CSAM was allegedly generated using Grok, while other CSAM was allegedly generated using the unidentified third-party application that (Plaintiffs say) relied on Stability's open-weight models.

**B. Defendants' Generative AI Models**

Both Stability and X.AI offer text-to-image and text-to-video generation models. The similarities between their models and business practices, however, end there. Stability's models are open weight: much like a developer of open-source software, Stability publicly releases trained model weights so that third-party developers can download, inspect, fine-tune, and build upon them. Compl. ¶¶ 4 n.3, 100–01.[2] Unlike X.AI, Plaintiffs allege that Stability does not host image generation on its own servers, does not distribute generated content to end users, and does not control how third parties deploy its models. Compl. ¶¶ 100–01, 113. No Plaintiff alleges that Stability itself generated, distributed, or possessed any CSAM. The Complaint instead alleges that a third party took one or more of Stability's models, created a separate application using those models that "relied on Stability AI's image-producing tools," and that the criminal perpetrator then used that third-party application to generate CSAM of Jane Does 1–3. Compl. ¶¶ 142, 148, 156. The Complaint does not allege that Stability created, operated, or controlled that application or

[2] Although the Complaint alleges that Stability released the models Stable Diffusion 1.0 through 1.5, *see* Compl. ¶¶ 106–07, that is not accurate. Those models were in fact developed by third parties. Stability's first Stable Diffusion model release was Stable Diffusion 2.0.

that Stability had any relationship with the third-party application or the perpetrator. Similarly, while the Complaint includes boilerplate and conclusory allegations that Stability received "monetary gain," it includes no well-pleaded allegations for how that is possible in light of the Complaint's acknowledgement that Stability's models are open-weight. Plaintiffs also acknowledge that Stability's models were developed with built-in safeguards to prevent CSAM generation. For example, Stable Diffusion 2.0 incorporated "much stronger guardrails intended to prevent illegal content, including CSAM," such as "an NSFW filter on training data," which produced "a decrease in NSFW content." Compl. ¶ 110.[3]

Plaintiffs' allegations against X.AI stand in stark contrast. X.AI developed, released, and marketed its models wholly independently of Stability, and with entirely different safety protocols. Plaintiffs allege that X.AI designed and marketed Grok's ability to generate explicit content, making it "part of Grok's DNA." Compl. ¶ 63. X.AI allegedly chose not to deploy industry-standard safeguards against the creation of sexual and abusive content in its image- and video-generation systems. Compl. ¶¶ 63–64. In fact, generating adult-oriented content was an outright developmental aim for Grok: X.AI launched "Spicy Mode" on October 20, 2025, intending it to be a feature that "pushes the boundaries of visual storytelling and creative expression in AI-generated video." Compl. ¶ 67. Shortly thereafter, Grok's official account on X posted public instructions on how to access Spicy Mode to create "NSFW" content. Compl. ¶ 68. Every other major AI company running large image-generation models specifically designed its tools without the ability to generate sexually explicit content. Compl. ¶ 80.

Thus, rather than trying to avoid generating problematic imagery, X.AI allegedly pursued the opposite goal. For example, X.AI published the Grok 4 system prompts that encouraged permissive responses from Grok by instructing the model to "assume good intent" and not make worst-case assumptions—specifying that "'teenage' or 'girl' does not necessarily imply underage"—and by imposing "no restrictions" on fictional adult content with dark or violent themes. Compl. ¶ 69. Elon Musk, the CEO of X.AI, treated safeguards dismissively. He personally began a non-consensual sexualization trend

---

[3] Stability has also worked with leading child safety NGOs to commit to implementing child safety principles into its technologies and products, to guard against the creation and spread of AI-generated child sexual abuse material. *See* https://stability.ai/safety.

on X, the "put her in a bikini" trend, which spawned a flood of sexualized AI-generated content. Compl. ¶ 71. He later made light of the phenomenon, posting "Poor Grok 😂." Compl. ¶ 77.

**<u>LEGAL STANDARD</u>**

Multiple defendants may be joined in a single action only if: (1) "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences"; and (2) the action raises "any question of law or fact common to all defendants." Fed. R. Civ. P. 20(a)(2). Both requirements are necessary. *See Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980) (Rule 20(a) "imposes two specific requirements for the permissive joinder of parties"); *Cambronne, Inc. v. Anthropic PBC*, 834 F. Supp. 3d 831, 833 (N.D. Cal. 2026) ("A plaintiff seeking joinder must meet both prongs of Rule 20(a)."). Failing either requirement defeats joinder. *See Corley v. Google, Inc.*, 316 F.R.D. 277, 282–83 (N.D. Cal. 2016) (finding misjoinder under the first requirement and declining to reach the second). Even if joinder is proper, a court retains wide discretion to sever defendants at any time if adjudicating claims against multiple defendants in a single action would not "comport with the principles of fundamental fairness" or would otherwise impede judicial economy, confuse the jury, or prejudice the parties. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296–97 (9th Cir. 2000); *see also SEC v. Leslie*, 2010 WL 2991038, at *4 (N.D. Cal. July 29, 2010).

When parties are improperly joined, a court may remedy the misjoinder by severing the misjoined party under Rule 21. Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party" to address misjoinder). Because Rule 21 supplies no independent standard for misjoinder, courts look to Rule 20 for guidance. *See Coughlin v. Rogers*, 130 F.3d 1348, 1351 (9th Cir. 1997) ("If joined plaintiffs fail to meet both of [Rule 20(a)'s] requirements, the district court may sever the misjoined plaintiffs, as long as no substantial right will be prejudiced by the severance."); *Bias v. Wells Fargo & Co.*, 2012 WL 2906664, at *2 (N.D. Cal. July 13, 2012).

## ARGUMENT

### I. Plaintiffs' Claims Against Stability Have Been Improperly Joined with Those Against X.AI.

#### A. The TN Does' Claims Against Stability and X.AI Arise from Separate Transactions or Occurrences.

Claims arise from the same "transaction or occurrence" under Rule 20(a)(2)(A) only when there is "similarity in the factual background" of the claims. *Coughlin*, 130 F.3d at 1350. That standard is not met merely because the claims involve the same general type of conduct. For example, in *Coughlin*, the Ninth Circuit affirmed the severance of forty-nine plaintiffs who each challenged the same agency's delay in adjudicating their applications, because each claim turned on its own facts rather than a common pattern of events. *See id.* at 1350–51. So, for example, a court may decline to find a common transaction where unaffiliated defendants are not alleged to have acted together. *E.g.*, *Cambronne*, 834 F. Supp. 3d at 834 ("There are no allegations of conspiracy that could justify joinder."). Plaintiffs' claims against Stability and X.AI fail the Rule 20 test.

There is no relevant "occurrence" common to Stability, X.AI, and Plaintiffs. As detailed above, Jane Does 4 and 5 allege no facts whatsoever related to Stability and therefore have no claims against it. The TN Does, meanwhile, allege that a single perpetrator used two different applications—Grok and an unnamed third-party app—to generate CSAM depicting them. *Coughlin* forecloses the conclusion that a common "occurrence" could simply be the creation of CSAM using generative AI. In *Coughlin*, each plaintiff alleged the same type of harm, under the same legal theories, against the same defendant. 130 F.3d at 1349–50. Yet, "the existence of a common allegation . . ., in and of itself, does not suffice to create a common transaction or occurrence." *Id.* at 1350. Similarly, in *Cambronne*, this Court held that Rule 20(a) was not satisfied where the plaintiffs alleged that each of the defendants had trained its generative AI models using the same database of material, because each defendant's training was independent of the others. 834 F. Supp. 3d at 834.

Plaintiffs have joined two wholly unrelated Defendants and expressly alleged that Defendants have markedly different business practices. Even assuming that Plaintiffs suffered the same type of injury from each Defendant's alleged conduct, there is no single creation of CSAM common to the claims. One series of occurrences was the perpetrator's alleged creation of CSAM using Grok, and a wholly separate series

of occurrences was the perpetrator's alleged creation of CSAM using the third-party application. Compl. ¶¶ 142, 148, 156. Because those series are factually distinct, just as in *Coughlin* and *Cambronne*, Plaintiffs cannot satisfy the common transaction or occurrence test.[4]

To prove their claims against each Defendant, Plaintiffs will need to present different evidence and an entirely different theory of liability because Defendants' relationships to their models differ. X.AI operates its proprietary Grok model. Grok generates content on X.AI's own servers and distributes it, among other locations, through X.AI's platforms. Compl. ¶¶ 81, 123–25. By contrast, Stability has released open-weight models that third parties use outside of Stability's control. Compl. ¶¶ 100–01, 113. When a third party uses Stability's open-weight models, Stability has no insight into that use, which happens on servers controlled by the third party, not by Stability. *See* Compl. ¶ 206 (alleging that "Grok produced this CSAM on X.AI's own servers" while Stability's "open-weight models—released to the public and incorporated into third-party applications—produced this CSAM when run by users").

The Complaint's class definitions likewise recognize the factual distinctness of Plaintiffs' claims, defining separate X.AI and Stability AI classes, thus separating the putative class members by Defendant. Compl. ¶ 194. The X.AI Class covers images "altered by xAI/Grok," while the Stability AI Class covers images "altered by an app built upon a Stability AI model." *Id.* And Plaintiffs' proposed common questions are framed around each Defendant's "respective" AI model—implicitly acknowledging that there will not be common questions *between* the models. *Id.* ¶¶ 199, 202. Courts have found similar allegations to support misjoinder. In *Bias*, the plaintiffs pleaded subclasses defined by which defendant serviced their loans, and although the claims were "based upon the same basic scenario and same legal theories," the court severed them because the challenged practices were alleged to be uniform only "within each Defendant group and not as a result of any common plan or scheme." 2012 WL 2906664, at *2–3. The same holds true here.

---

[4] Plaintiffs may argue that they have pleaded relief in the alternative, but that is not supported by the Complaint. Although not a model of clarity, the Complaint does clearly state that the perpetrator used both Grok and a third-party app powered by Stability.AI. *Supra* Background Part A. That is particularly the case given that Plaintiffs *removed* allegations from the original complaint claiming that the third-party app was powered by Grok.

**B. Any Common Questions Plaintiffs May Identify Do Not Solve the Absence of a Common Transaction.**

Because Rule 20(a)(2) requires *both* a common transaction and a common question, the failure of the first prong is dispositive. *Desert Empire Bank*, 623 F.2d at 1375; *Cambronne*, 834 F. Supp. 3d at 833. Courts in this District find misjoinder on the "transaction or occurrence" requirement alone without reaching commonality, *see Corley*, 316 F.R.D. at 282–83, 289; *Renati v. Wal-Mart Stores, Inc.*, 2019 WL 5536206, at *5 (N.D. Cal. Oct. 25, 2019), and do so even where a common question would likely exist, *see Corley*, 316 F.R.D. at 289 n.5 (noting that the court "would likely find" the common-question requirement satisfied). Thus, even if Plaintiffs identify some purportedly common questions, they will be irrelevant to the outcome of this Motion.

**II. The Court Should Exercise Its Discretion to Sever for Reasons of Judicial Economy and to Prevent Unfair Prejudice to Stability.**

The Court can also sever the claims against the two Defendants because—regardless of whether joinder was proper in the first place—joinder here would not "'comport with the principles of fundamental fairness' [and] would result in prejudice to" Stability. *Coleman*, 232 F.3d at 1296–97 (quoting *Desert Empire Bank*, 623 F.2d at 1375) (district court did not abuse discretion severing certain plaintiffs' claims without finding improper joinder). Permitting Plaintiffs to force together Defendants whose only relationship is their industry and the fact that unrelated third parties independently misused their models would be inefficient, unfair, and prejudicial.

The interests of judicial economy weigh strongly in favor of severance here. A single case involving sixteen causes of action, four plaintiff classes, and two fundamentally different Defendants and AI model architectures will be unwieldy, complex, and confusing. These burdens and complexities will not appear only at trial: discovery involving two competitors will necessarily be more burdensome and challenging given the need to protect each Defendant's proprietary information that may be sought in discovery.

Likewise, Plaintiffs will require entirely different witnesses and documents to prove their claims against each of X.AI and Stability. X.AI's witnesses will of course include X.AI personnel, none of whom will have any relevance to Stability's conduct. Conversely, none of Stability's own witnesses has any

relevance to X.AI's conduct. And even the perpetrator evidence will differ, in light of the TN Does' allegation that the perpetrator used Grok as well as an unnamed app to generate CSAM depicting them.

The recent petition to create an MDL coordinating cases against X.AI further supports severance. *See In re: x.AI/Grok Artificial Intelligence Minor Sexual Exploitation Litig.*, MDL No. 3205, ECF No. 1 (petitioning JPML to transfer 13 cases involving CSAM-related claims against X.AI, of which only this case includes Stability as a defendant). If the X.AI cases are centralized before a single judge, judicial economy would be best served by allowing those cases to proceed together while Plaintiffs' separate claims against Stability proceed separately. Even if the JPML does not create an MDL, there are already five related cases against X.AI pending before this Court, only one of which names Stability as a defendant. Forcing Stability into discovery alongside a growing constellation of X.AI-focused cases would compound inefficiency rather than reduce it.

Severance will also avoid prejudice to Stability. The allegations of direct misconduct against X.AI are far starker than the allegations against Stability. There is thus a substantial risk that Plaintiffs' claims against Stability will be conflated and tainted by association with X.AI's alleged content and conduct. *See, e.g.*, *Wynn v. Nat'l Broad. Co., Inc.*, 234 F. Supp. 2d 1067, 1089 (C.D. Cal. 2002) (severing claims against multiple employer defendants to avoid "unfair prejudice" and "guilt by association" where "a decision by one company might taint the jury's view of another decision made by a different company"). As detailed above, Plaintiffs' allegations against the two Defendants are markedly different, and their X.AI-specific allegations cannot give rise to liability as to Stability. The presence in this case of two Plaintiffs who allege facts only against X.AI would further exacerbate the prejudice: Jane Doe 4 alleges that her stepfather used Grok to generate approximately 7,000 sexually explicit images of her as an 11-year-old, and that X.AI "obstructed [a Wyoming ICAC] investigation at every turn." Compl. ¶¶ 159, 172. These serious and disturbing allegations have no relationship to Stability or its conduct, underscoring the prejudice that Stability would endure if forced to litigate this case alongside X.AI.

Plaintiffs, meanwhile, would not be prejudiced by severance. The TN Does will remain free to pursue their claims against both Stability and X.AI in separate actions. *Cf. Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 871 (9th Cir. 2013) ("[S]everance will not prejudice Plaintiffs, as they remain free to pursue

their claims individually."). If anything, severance should streamline discovery in these cases and allow them to move forward more expeditiously than a multi-Defendant case involving direct competitors.

**CONCLUSION**

For the foregoing reasons, the Court should sever all claims asserted against Stability from those asserted against X.AI, direct the Clerk to open a new action for Plaintiffs' claims against Stability, and order the TN Does to file a new complaint in that action solely against Stability within 15 days.

Respectfully submitted,

Dated: October 9, 2026

COVINGTON & BURLING LLP

By: */s/ Isaac D. Chaput*

Isaac D. Chaput
Cecilia M. Bobbitt
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com
cbobbitt@cov.com

Emily Johnson Henn
COVINGTON & BURLING LLP
3000 El Camino Real, 5 Palo Alto Square
Palo Alto, CA 94306-2112
(650) 632-4700
ehenn@cov.com

*Counsel for Defendants Stability AI, Inc. and Stability AI US Services Corporation*